971 A.2d 403 (2009)
407 N.J. Super. 330
A.B., Petitioner-Appellant,
v.
DIVISION OF MEDICAL ASSISTANCE & HEALTH SERVICES and Camden County Board of Social Services, Respondents-Respondents.
No. A-1855-06T1.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 2008.
Decided May 15, 2009.
*405 Candidus Dougherty, Philadelphia, PA, argued the cause for appellant (Rutgers *406 Civil Practice Clinic, attorneys; Traci Overton, Supervising Attorney; Ms. Dougherty and F. Gregory Lastowka of the Pennsylvania bar, admitted pro hac vice, on the brief).
Dianna Rosenheim, Deputy Attorney General, argued the cause for respondent Division of Medical Assistance and Health Services (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Caitlin A. McLaughlin, Deputy Attorney General, on the brief).
Respondent Camden County Board of Social Services has not filed a brief.
Before Judges CUFF, C.L. MINIMAN and BAXTER.
The opinion of the court was delivered by
C.L. MINIMAN, J.A.D.
Petitioner A.B. appeals from an October 10, 2006, final decision of respondent Division of Medical Assistance and Health Services (the Division) finding that A.B. was not eligible to participate in the New Jersey Care Program (NJCare), N.J.A.C. 10:72-1.1 to -9.8. We affirm.

I.
The facts are undisputed. A.B., a Russian immigrant who is now ninety years old, became a lawful permanent resident (LPR) of the United States on December 1, 2005. Prior to that time, A.B. was physically present in the United States for six months in 1992, for two months in 1994, and for two months in the spring of 1996. With these exceptions, A.B. resided in Russia prior to obtaining LPR status here.
On December 19, 2005, A.B. applied to the Camden County Board of Social Services (CCBSS) for benefits under NJCare,[1] stating that he was unemployed and had no source of income. The CCBSS denied A.B.'s application on January 3, 2006, stating that he did not meet the eligibility requirements of N.J.A.C. 10:72-3.4(a)(5), which includes persons over the age of sixty-five as persons eligible for Medicaid benefits, because he had not been in the country for five years (the five-year bar), as required by N.J.A.C. 10:72-3.2. The regulation provides in pertinent part that if a person who is otherwise eligible for Medicaid benefits was not "present in" the United States prior to August 22, 1996, such person must thereafter reside in this country for five years in order to qualify for benefits:
(a) In order to be eligible for the Medicaid program, an individual must be a citizen of the United States, an alien lawfully admitted for permanent residence, or an alien approved for temporary residence who can be classified as an eligible alien in accordance with this chapter.
. . . .
(b) The following aliens, if present in the United States prior to August 22, 1996, and if otherwise meeting the eligibility criteria, are entitled to full Medicaid benefits:
1. An alien lawfully admitted for permanent residence;
. . . .
(c) The following aliens entering the United States on or after August 22, 1996, and if otherwise meeting the eligibility *407 criteria, are entitled to Medicaid benefits:
1. An alien lawfully admitted for permanent residence but only after having been present in the United States for five years....
[Ibid.]
On January 10, 2006, A.B. requested a hearing and the Division referred the matter to the Office of Administrative Law (OAL) as a contested case pursuant to N.J.A.C. 10:6-1.3(a) and N.J.S.A. 52:14B-9. The Administrative Law Judge (ALJ) left the record open until August 27, 2006, during which time A.B. and CCBSS submitted supplemental briefs. On September 18, 2006, the ALJ issued an initial decision in favor of A.B. in which he recited the following facts stipulated by the parties:
1. Prior to August 22, 1996, [A.B.] was physically present in the United States for six months in 1992, two months in 1994 and for two months in the spring of 1996.
2. If [A.B.] is found to meet the "present in" requirement of N.J.A.C. 10:72-3.2(b), he is eligible for [NJCare] Medicaid benefits.
3. [A.B.] became a permanent resident on December 1, 2005, as indicated on his Permanent Resident Card. [(Citation omitted).]
4. [The Division] relies on N.J.A.C. 10:72-3.2(c)(1) to deny [A.B.'s] request for NJC[are] because he has not been present in the United States for five years.
5. A.B. relies on N.J.A.C. 10:72-3.2(b)(2) for [his] argument that [he] should be granted refugee status, but acknowledges that he has not been admitted pursuant to section 207 of the Immigration and Naturalization Act.
6. N.J.A.C. 10:72-3.2(e)(3)(ii) sets forth acceptable documentation for eligible alien/refugees. [A.B.] does not possess any of the specified documentation.
7. [A.B.] was born on November 27, 1918.
8. Medicaid Communication No. 17, dated October 5, 1999, which requires continuous presence in the United States, prior to August 22, 1996, is an interpretation by The Department of Human Services (DHS) and not a rule promulgated in accordance with the Administrative Procedures Act (APA).
The ALJ concluded that the phrase "present in the United States" contained in the eligibility for NJCare, N.J.A.C. 10:72-3.2(b), was satisfied by A.B.'s presence in the United States for six months in 1992, two months in 1994, and two months in 1996. The ALJ relied on the ordinary meaning of "present," statutory definitions of the term, and judicial decisions construing it. The ALJ concluded that "present in" was not synonymous with "continuously present in," but connoted something much less permanent and reversed the denial of benefits.
The CCBSS filed an exception on September 29, 2006, on the ground that NJCare is a Medicaid program governed by "Medicaid Communication No. 17," which requires continuous presence from some date prior to August 22, 1996, until the individual has acquired qualified alien status. CCBSS urged that this communication was an interpretation of N.J.A.C. 10:72-3.2(b) and was consistent with eligibility requirements for aliens in other entitlement programs, such as N.J.A.C. 10:90-2.10(a)(1). A.B. filed a cross-exception and motion for emergency relief requesting temporary NJCare eligibility on October 3, 2006. He argued that Medicaid Communication No. 17 had not been the subject of rulemaking, as required *408 by the New Jersey Administrative Procedures Act, N.J.S.A. 52:14B-1 to -15, and was thus invalid and that other regulations, such as N.J.A.C. 10:90-2.10(b)(1)(x), specifically required continuous presence, unlike N.J.A.C. 10:72-3.2(b).

II.
On October 10, 2006, Ann Clemency Kohler, the Division's Director, issued a timely Final Agency Decision reversing the ALJ's Initial Decision and denying A.B.'s motion for temporary eligibility for NJCare. The Division determined that "[f]ederal policy clearly states that continuous presence is an essential prerequisite to a finding of Medicaid eligibility. Indeed, guidance from the Centers for Medicare and Medicaid Services (CMS), the federal agency charged with overseeing the Medicaid program, provides questions and answers to issues regarding alien status and eligibility." The Division quoted the following portion of the document:
Q8. What about undocumented immigrants who entered the United States prior to August 22, 1996, but obtained qualified alien status after that date?
Based on interim guidance issued by the U.S. Department of Justice (DOJ), immigrants, who entered the country without proper documents as well as those who overstayed their visa are treated the same as those who entered and remain in the country with valid immigration documents.
Thus, all immigrants who (1) entered the country prior to August 22, 1996 and (2) remained continuously present in the United States until becoming a qualified alien, are eligible for Medicaid immediately upon obtaining qualified alien status, provided that they otherwise are eligible for coverage under your state plan. See Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Federal Register 61344 at 61414-61416 (November 17, 1997).
Q9. What does it mean to remain "continuously present" in the United States?
To avoid application of the five-year bar, immigrants who entered the United States before August 22, 1996, but who obtain qualified alien status on or after that date, must remain "continuously present["] in this country from their last date of entry into the United States prior to August 22, 1996 until they obtain qualified alien status. Any single absence from the United States of more than 30 days, or a total aggregate of absences of more than 90 days, is considered to interrupt "continuous presence." Once an immigrant obtains qualified alien status, he or she does not have to remain continuously present in the United States in order to avoid application of the five-year bar. "Continuous presence" is discussed in more detail in DOJ's Interim Guidance at 62 Federal Register 61415.
Immigrants who (1) entered the United States at some point prior to August 22, 1996 and (2) obtained qualified alien status on or after that date, but (3) did not remain continuously present in the United States from their last date of entry into the country prior to August 22, 1996, until they became a qualified alien, are not considered as having entered the United States prior to August 22, 1996. Accordingly, such immigrants are subject to the five-year bar.
http://new.cms.hhs.gov/Medicaid Eligibility/downloads/FiveYearBar3.pdf
*409 The Director concluded that A.B. "did not remain `continuously present' in the United States since his last visit in the spring of 1996. [A.B.'s] five-year bar began on the date he obtained qualified alien status, or December 1, 2005." Thus, the Director concluded that NJCare benefits were correctly denied to A.B. This appeal followed.
A.B. contends that the Division did not clearly state its reasons for rejecting the Initial Decision, contrary to statutory, regulatory, and common-law requirements. He further contends the Division violated his due process rights because the Final Agency Decision had no basis in law. He argues that NJCare is a state-funded program which should be interpreted in accordance with New Jersey  not federal  law and that state law mandates the provision of NJCare benefits because he was present in the United States before August 22, 1996, was an LPR at the time of his application, and any other interpretation would violate the federal Equal Protection Clause. He urges that state law defines the term "present in" as being physically within the borders of New Jersey without any durational component. He alleges that the agency failed to amend N.J.A.C. 10:72-3.2(b) through rulemaking to give it any other meaning and asserts that Medicaid Communication No. 17 was never promulgated as a rule under the New Jersey Administrative Procedures Act, N.J.S.A. 52:14B-1 to -15. Thus, he urges, it is not applicable to a determination of NJCare benefits.
The Division, on the other hand, asserts that both federal and state law mandate that NJCare benefits are subject to the five-year bar from the date of LPR designation, making A.B. ineligible for benefits. It further asserts that its action was not arbitrary, capricious or unreasonable and was supported by credible evidence in the record.

III.
Our review of final decisions by administrative agencies such as this is restricted to the following four inquires:
(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).]
Generally, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." Burris v. Police Dep't, W. Orange, 338 N.J.Super. 493, 496, 769 A.2d 1112 (App.Div.2001) (citation omitted). The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action. McGowan v. N.J. State Parole Bd., 347 N.J.Super. 544, 563, 790 A.2d 974 (App.Div.2002) (citation omitted).
However, "[i]t is settled that `[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 56, 766 A.2d 312 (App.Div. 2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J.Super. 93, 102, 704 A.2d 562 (App.Div.1997)). *410 Nevertheless, "we are not bound by the agency's legal opinions." Levine v. State, Dep't of Transp., 338 N.J.Super. 28, 32, 768 A.2d 192 (App.Div.2001) (citation omitted). Statutory and regulatory construction is a purely legal issue subject to de novo review. Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973).
"[A] rule of an administrative agency is subject to the same canons of construction as a statute." In re N.J.A.C. 14A:20-1.1, 216 N.J.Super. 297, 306, 523 A.2d 686 (App.Div.1987) (citation omitted). N.J.S.A. 1:1-1 provides general instructions for judicial construction of statutes and laws in New Jersey:
In the construction of laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.
Therefore, when a court is called upon to review a statute, determining the Legislature's or the agency's intent is the paramount goal and, generally, the best indicator of that intent is the statutory or regulatory language itself. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005) (citation omitted). We begin with the words of the statute or regulation and ascribe to them their ordinary meaning. Mason v. City of Hoboken, 196 N.J. 51, 68, 951 A.2d 1017 (2008). We will read the words in context with related provisions so as to give sense to the legislation or regulatory scheme as a whole. DiProspero, supra, 183 N.J. at 492, 874 A.2d 1039.
"It is not the function of [a reviewing court] to `rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language.'" Ibid. (quoting O'Connell v. State, 171 N.J. 484, 488, 795 A.2d 857 (2002)). We "cannot `write in an additional qualification that the Legislature pointedly omitted in drafting its own enactment.'" Ibid. (quoting Craster v. Bd. of Comm'rs of Newark, 9 N.J. 225, 230, 87 A.2d 721 (1952)). Nor may we "`engage in conjecture or surmise which will circumvent the plain meaning of the act.'" Ibid. (quoting In re Closing of Jamesburg High Sch., 83 N.J. 540, 548, 416 A.2d 896 (1980)). Therefore, if the meaning of those words is clear, the analysis is complete and we need look no further. Mason, supra, 196 N.J. at 68, 951 A.2d 1017.
On the other hand, common sense should not be abandoned when interpreting a statute:
[W]e also have stressed that "where a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law should control." Turner v. First Union Nat. Bank, 162 N.J. 75, 84, 740 A.2d 1081 (1999) (citing Watt v. Mayor of Franklin, 21 N.J. 274, 278, 121 A.2d 499 (1956)). Thus, when a "`literal interpretation of individual statutory terms or provisions'" would lead to results "`inconsistent with the overall purpose of the statute,'" that interpretation should be rejected. [Alan J.] Cornblatt[, P.A.] v. Barow, 153 N.J. 218, 242, 708 A.2d 401 (1998) (quoting Young [v. Schering Corp.,] 141 N.J. [16,] 25, 660 A.2d 1153 [(1995))].
[Hubbard v. Reed, 168 N.J. 387, 392-93, 774 A.2d 495 (2001).]
So too, "[a] regulation `[should] not be interpreted in a manner leading to absurd or unreasonable results.'" Walcott v. City of Plainfield, 282 N.J.Super. 121, 127, 659 *411 A.2d 532 (App.Div.1995) (quoting Reisman v. Great Am. Recreation, Inc., 266 N.J.Super. 87, 96, 628 A.2d 801 (App.Div.), certif. denied, 134 N.J. 560, 636 A.2d 519 (1993)).
Thus, "[w]e may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language." DiProspero, supra, 183 N.J. at 493, 874 A.2d 1039. Such extrinsic evidence includes legislative history, sponsor's statements, committee reports, and any other germane evidence that may assist the court in determining the intent behind the language. Roberts v. State, Div. of State Police, 191 N.J. 516, 521, 924 A.2d 550 (2007).

IV.
The Division was created by N.J.S.A. 30:4D-4 in 1968 when the Legislature adopted the New Jersey Medical Assistance and Health Services Act (the Act), N.J.S.A. 30:4D-1 to -19.5, to
enable the State of New Jersey to provide medical assistance, insofar as practicable, on behalf of persons whose resources are determined to be inadequate to enable them to secure quality medical care at their own expense, and to enable the State, within the limits of funds available for any fiscal year for such purposes, to obtain all benefits for medical assistance provided by the Federal [SSA]....
[N.J.S.A. 30:4D-2.]
The Legislature designated the Department of Human Services (the Department) as "the single State agency to administer the provisions of [the Act], through the Division" and mandated that it "implement and administer the program of medical assistance to provide necessary medical care and services for qualified applicants as provided by [the Act]." N.J.S.A. 30:4D-5. The Department is required to provide authorized services within enumerated classifications "[s]ubject to the requirements of Title XIX of the federal [SSA], the limitations imposed by this act and by the rules and regulations promulgated pursuant thereto...." N.J.S.A. 30:4D-6a.
Title XIX was designed to provide Medicaid to assist low-income persons to obtain necessary medical care and services. L.M. v. State, Div. of Med. Asst. & Health Servs., 140 N.J. 480, 484, 659 A.2d 450 (1995). The Medicaid program is fairly characterized as a "cooperative federal-state endeavor" where, in return for federal monies, states must comply with federal requirements. Ibid.; see also 43 U.S.C.A. § 1396a(a)(17)(A). Each state in turn is responsible for developing a program that includes "reasonable standards" for determining Medicaid eligibility. L.M., supra, 140 N.J. at 484, 659 A.2d 450. An applicant is entitled to Medicaid benefits "if he fulfills the criteria established by the State in which he lives." Schweiker v. Gray Panthers, 453 U.S. 34, 36-37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460, 465 (1981).
Participating states are required under federal law to provide assistance to the "categorically needy," which includes those persons eligible for benefits under Aid to Families with Dependent Children (AFDC) and Supplemental Security Income (SSI). Mistrick v. Div. of Med. Asst. & Health Servs., 154 N.J. 158, 163, 712 A.2d 188 (1998); 42 U.S.C.A. §§ 1396-1396v. States at their option may provide assistance to other classes of "medically needy" individuals, whose income and resources cannot meet their medical needs, but who are not qualified for cash assistance under the AFDC or SSI programs. See Mistrick, supra, 154 N.J. at 163, 712 A.2d 188; see also 42 U.S.C.A. §§ 1396a(a)(10)(C), 1396d(a).
*412 In 1996, Congress enacted legislation that had a profound effect upon aliens' access to medical benefits. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the PRWORA), Pub.L. No. 104-193, 110 Stat. 2105 (1996), (codified at 8 U.S.C.A. §§ 1601 to 1646), was designed to reduce the impact of "aliens ... applying for and receiving public benefits from Federal, State, and local governments at increasing rates." 8 U.S.C.A. § 1601(3). PRWORA "imposes several limitations on the availability of Medicaid benefits to aliens." Soskin v. Reinertson, 353 F.3d 1242, 1245-46 (10th Cir.2004).
There are two classes of aliens: "qualified aliens" and "unqualified aliens." The definition of "qualified aliens" includes, among others, aliens who were "lawfully admitted for permanent residence under the Immigration and Nationality Act." 8 U.S.C.A. § 1641(b)(1)-(4). "Unqualified aliens" are all aliens who do not fall within the definition of "qualified aliens." Id. at § 1611(a). Only qualified aliens are eligible for most federal means-tested public benefits. Soskin, supra, 353 F.3d at 1245; 8 U.S.C.A. § 1611(a).
Qualified aliens entering the United States on or after August 22, 1996, are "not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien's entry into the United States," 8 U.S.C.A. § 1613(a), unless they were receiving benefits as of that date, in which case the states were required to continue their benefits until January 1, 1997, id. § 1612(b)(2)(D). After the five-year bar, states may determine qualified aliens eligibility for Temporary Assistance for Needy Families, Social Services Block Grants, and Medicaid. Id. § 1612(b)(1), (3). Nonetheless, states must provide Medicaid to LPRs who have worked forty quarters and have been LPRs for five years. Id. §§ 1612(b)(2)(B), 1613.
The PRWORA grants states the authority to determine the eligibility of qualified aliens for state public benefits but, among other things, may not limit state public benefits to those aliens who have been lawfully admitted and have worked for forty qualifying quarters. 8 U.S.C.A. §§ 1622(a), 1622(b)(2)(B). However, such benefits may not be paid to unqualified aliens, id. § 1621(a), unless the state passes legislation subsequent to adoption of the PRWORA extending state benefits to such aliens, id. § 1621(d).
The passage of the PRWORA required New Jersey to amend the Act to bring it into compliance with federal law. See L. 1997, c. 352. The Assembly Appropriations Committee, in reporting favorably on Senate Bill 2170, issued a statement commenting in pertinent part as follows:
Senate Bill No. 2170 amends N.J.S.A. 30:4D-1 et seq. to conform Medicaid eligibility requirements for alien residents of the State to provisions of the federal "Personal Responsibility and Work Opportunity Reconciliation Act of 1996," Pub.L. 104-193. Specifically, the bill:
 Limits the criteria by which legal aliens can qualify for Medicaid to those entering the United States before August 22, 1996, [and] lawful permanent residents with 40 quarters of work history....
 Provides Medicaid assistance to lawful permanent residents without regard to quarters of work history and to other categories of legal aliens if they were in the United States prior to August 22, 1996;
 Prohibits Medicaid eligibility for legal aliens entering the United States on or after August 22, 1996 for the first five years after entry, but requires Medicaid *413 coverage after the five-year period elapses for those otherwise eligible legal aliens who have compiled 40 quarters of work history....
 Provides Medicaid assistance to lawful legal aliens entering the United States on or after August 22, 1996 after the five-year ban on eligibility expires without regard to quarters of work history and to other categories of legal aliens beyond the five-year period of required Medicaid coverage.
[Assembly Appropriations Committee, Statement to Senate Bill No. 2170 (Dec. 11, 1997).]
The Act's statutory definitions were accordingly amended. L. 1997, c. 352, § 1. The term "qualified applicant," which previously meant a resident of New Jersey who was determined to need medical care and services as provided under the Act, was redefined and now provides that a "[q]ualified applicant" means a person who is a resident of this State, and either a citizen of the United States or an eligible alien.... N.J.S.A. 30:4D-3i.
The term "eligible alien" was defined in pertinent part as "an alien present in the United States prior to August 22, 1996, who is a lawful permanent resident ... [or a]n alien who entered the United States on or after August 22, 1996, who is" an LPR. N.J.S.A. 30:4D-3q(1)(a), -3q(2)(b).
The 1997 amendments clarified the ability of aliens to secure benefits by adding the following provision:
An eligible alien as defined in [N.J.S.A. 30:4D-3] who otherwise meets all eligibility criteria therefor is entitled to medical assistance provided pursuant to [N.J.S.A. 30:4D-6]. An alien who does not qualify as an eligible alien but who is a resident of New Jersey and would otherwise be eligible for medical assistance provided pursuant to [N.J.S.A. 30:4D-6] is entitled only to care and services necessary for the treatment of an emergency medical condition as defined in section 1903(v)(3) of the federal Social Security Act (42 U.S.C.A. § 1396b(v)(3)).
[N.J.S.A. 30:4D-6f.]
The Act had always required the Division to administer its provisions "by rules and regulations [that] implement and administer the program of medical assistance to provide necessary medical care and services for qualified applicants as provided by this act." N.J.S.A. 30:4D-5. As a result, the Division over time promulgated regulations for four Medicaid programs: AFDC-Related Medicaid, N.J.A.C. 10:69-1.1 to -12.10; the Medically Needy Program, N.J.A.C. 10:70-1.1 to -7.3; Medicaid Only, N.J.A.C. 10:71-1.1 to -9.5; and the New Jersey Care ... Special Medicaid Program, N.J.A.C. 10:72-1.1 to -9.8.
NJCare, like the other three programs, is a Medicaid program promulgated pursuant to the Act and funded by the State. It had been adopted on an emergency basis on June 29, 1987, to provide additional assistance to pregnant women and children. 19 N.J.R. 1324 (Jul. 20, 1987). This coverage was later expanded to include aged, blind, and disabled individuals not otherwise eligible under N.J.A.C. 10:71-1.1 to -9.5. 20 N.J.R. 548 (Mar. 7, 1988). Aliens were not excluded from participation, as the citizenship criteria for the program made clear that LPRs were eligible for benefits. 31 N.J.R. 97, 103 (Jan. 19, 1999).
The citizenship criteria for participation in the Medically Needy, Medicaid Only, and NJCare were significantly revised, effective August 2, 1999. See 31 N.J.R. 97 (Jan. 19, 1999); 31 N.J.R. 2203 (Aug. 2, 1999). Michele K. Guhl, Commissioner, Department of Human Services, explained that the 1999 amendments to the *414 citizenship requirements for these programs were being amended to "update the Medicaid State eligibility requirements by codifying Federal and State statutory requirements and Federal regulatory requirements related to aliens and services to alien pregnant women" in the referenced Medicaid programs. 31 N.J.R. 97 (Jan. 19, 1999). She further explained:
The Federal statute also requires the State to cover certain legal aliens for Medicaid benefits. The required coverage is dependent on the alien's date of entry into the United States. For aliens present in the United States prior to August 22, 1996, the State must cover otherwise eligible legal permanent residents who had 40 quarters of work history....
For aliens whose entry into the United States is on or after August 22, 1996, the State is required to provide Medicaid coverage to otherwise eligible legal permanent resident aliens who had resided in the United States for five years and who have 40 quarters of work history....
In addition to the Federally required coverage, the Federal legislation allows the State to cover additional qualified aliens. The proposed amendments codify in regulation this more expansive alien coverage as required by State statute.[[2]] Therefore, for aliens present in the United States prior to August 22, 1996, a legal resident alien, if otherwise eligible, may qualify for Medicaid without regard to the 40 quarters of work requirement.
[Ibid. (emphasis added).]
In describing the social impact of the amendments, the Commissioner commented that "[t]he alien eligibility rules have a minimal negative impact on legal immigrants, applicants, or beneficiaries who entered the country prior to August 22, 1996; only a relatively few legal aliens lost entitlement for Medicaid." 31 N.J.R. at 98. However, she expected the five-year bar on Medicaid benefits for new legal aliens to be significant. Ibid.
The adopted amendment to N.J.A.C. 10:72-3.2 governing NJCare benefits provides in pertinent part as follows:
(a) In order to be eligible for the Medicaid program, an individual must be a citizen of the United States, an alien lawfully admitted for permanent residence, or an alien approved for temporary residence who can be classified as an eligible alien in accordance with this chapter.
. . . .
(b) The following aliens, if present in the United States prior to August 22, 1996, and if otherwise meeting the eligibility criteria, are entitled to full Medicaid benefits:
1. An alien lawfully admitted for permanent residence;
. . . .
(c) The following aliens entering the United States on or after August 22, 1996, and if otherwise meeting the eligibility criteria, are entitled to Medicaid benefits:
1. An alien lawfully admitted for permanent residence but only after having been present in the United States for five years....
[31 N.J.R. 2203, 2209-10 (Aug. 2, 1999).]
This language, like that of N.J.A.C. 10:70-3.2 and 10:71-3.3, carefully tracks the revised language of the statutory definition of "eligible alien" in the Act under which *415 all three regulatory provisions were promulgated.
In construing N.J.A.C. 10:72-3.2(b), A.B. argues that it should be interpreted in accordance with state, not federal, law, making Medicaid Communications No. 17 irrelevant. This is so, he argues, because NJCare is purely a state Medicaid program with its own chapter of regulations. As such, he contends that the NJCare "does not need to apply the same standards as those applied by the federal government in its regulation of medical assistance services." He urges that this frees New Jersey to construe "present in the United States" in accordance with state law and without resort to federal law.
Indeed, A.B. argues that this precept is recognized in the NJCare regulation itself, which provides:
(a) This chapter contains the criteria for Medicaid eligibility for certain pregnant women and infants not eligible under the provisions of N.J.A.C. 10:69, as well as, certain aged, blind and disabled persons not eligible under the provisions of N.J.A.C. 10:71.
(1) Because the eligibility criteria established by the rules within this chapter are more liberal than those applicable under AFDC-related Medicaid and SSI-related Medicaid, pregnant women, infants, and aged, blind or disabled individuals losing Medicaid eligibility because of financial reasons should be evaluated under the provisions of this chapter for the possibility of continuing Medicaid eligibility.
[N.J.A.C. 10:72-1.1.]
A.B. further argues that, under state law, the definition of "present" is consistent with common-usage dictionary definitions, such as that in Webster's, which defines the term "present" as "being, existing, or occurring at this time...[;] being ... in the specified or understood place[;] ... [or] existing in a place." Webster's Encyclopedic Unabridged Dictionary of the English Language 1138 (Gramercy 1996). A.B. urges that "present in" means something that is temporary or fluid in nature and does not require a continuous, permanent presence. A.B. supports this argument by citing New Jersey statutes and case law, all of which to varying degrees assign a meaning of impermanence to the term "present" when contrasted to "residence" and "domicile." See, e.g., N.J.S.A. 2A:160-11; 2C:33-13; 39:8-73; James H. Rhodes & Co. v. Chausovsky, 137 N.J.L. 459, 461, 60 A.2d 623 (Sup.Ct.1948); Evans v. Perrine, 35 N.J.L. 221, 223 (Sup.Ct.1871); Citibank, N.A. v. Estate of Simpson, 290 N.J.Super. 519, 526, 676 A.2d 172 (App.Div.1996). He points out that the concept of "continuous presence" was expressed in N.J.A.C. 10:90-2.10(a)(1)(10) and, as a consequence, had it been required for NJCare benefits, the Division should have amended N.J.A.C. 10:72-3.2(b) to require it.
The Division insists that A.B.'s interpretation of the regulation is not a "reasonable reading," and that a "fair reading of N.J.A.C. 10:72-3.2(b) requires that the alien is present in the United States prior to August 22, 1996, and that he or she is a permanent resident at the time." The Division argues that the term "present" should be read contextually, that is, to not only read the term in concert with the regulatory intent behind NJCare, but also in conjunction with other federal and state Medicaid policies. The interpretation urged by A.B., it argues, leads to a result that is against the overall state and federal Medicaid schemes.
We conclude that the interpretation of "present in" urged by A.B. ignores the statutory mandate that "words and phrases shall be read and construed with their context." See N.J.S.A. 1:1-1 (emphasis *416 added). The disputed phrase in N.J.A.C. 10:72-3.2(b) must be read in the context of its subparts and the statutory and regulatory scheme as a whole. See DiProspero, supra, 183 N.J. at 492, 874 A.2d 1039 ("We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." (citations omitted)). The Division, of course, had to give effect to the statutory definition of "eligible alien" in N.J.S.A. 30:4D-3q. For our purposes, that definition clearly establishes two classes of aliens, both of them LPRs. One class consists of aliens who entered the country as LPRs before August 22, 1996, and the other class comprises aliens who entered the country as LPRs on or after that date. Ibid. That statutory classification governs N.J.A.C. 10:70, 10:71, and 10:72. We certainly cannot construe "eligible alien" differently depending on the specific program to which the term applies.
Furthermore, nothing in the Act suggests that the Legislature intended that aliens who entered the country as LPRs on or after August 22, 1996, and who had the good fortune to have traveled to the United States before that date on a tourist visa should be exempt from the five-year bar the Legislature imposed on all benefits provided under the Act. Yet that is precisely what A.B.'s interpretation of "present in" would accomplish. The Division had no authority to promulgate rules and regulations that would have created this third class of aliens because the Act specifically required that rules and regulations promulgated by the Director comply with its provisions. N.J.S.A. 30:4D-5. In fact, the regulations promulgated under the Act for federal Medicaid programs and NJCare uniformly complied with the statutory definition of "eligible alien," which conformed to the citizenship requirements of the PRWORA. It was clearly the Director's intent that the citizenship requirements for NJCare mirror the other Medicaid programs under the Act, as the Legislature provided. Even if NJCare is not required to conform to the PRWORA, the Director intended that it do so because she used virtually the same language for each of the three programs.
In this respect, A.B. misreads N.J.A.C. 10:72-1.1(a)(1). Although subparagraph (1) recites that "the eligibility criteria established by the rules within this chapter are more liberal than those applicable under AFDC-related Medicaid and SSI-related Medicaid," the citizenship criteria are clearly not. It is primarily the financial eligibility criteria of NJCare that are more liberal. See ibid. ("[P]regnant women, infants, and aged, blind or disabled individuals losing Medicaid eligibility because of financial reasons should be evaluated under the provisions of this chapter for the possibility of continuing Medicaid eligibility.").
While A.B. is correct in asserting that the ordinary use of the word "present" may in fact connote something that is temporary or brief in nature, especially when deciding in personam jurisdictional issues, that meaning as applied to N.J.A.C. 10:72-3.2(b), and indeed N.J.A.C. 10:70-3.2 and 10:71-3.3, would produce an absurd result. This is precisely the type of result the Supreme Court has cautioned should not be reached in construing statutes and regulations. Hubbard, supra, 168 N.J. at 392-93, 774 A.2d 495. It is clear from the statutory and regulatory history that there was no intent to discriminate between an otherwise-qualified alien who had merely stepped foot in the United States prior to August 22, 1996, and an otherwise-qualified alien who had not, providing NJCare and other Medicaid benefits to the former and subjecting the latter to a five-year bar simply because they did not have the foresight *417 to come here as a tourist before August 22, 1996.
Finally, we are satisfied that N.J.A.C. 10:90-2.10(a)(1)(x) provides no comfort to A.B. First, it was not promulgated pursuant to the Act, but under the Work First New Jersey program (WFNJ). See N.J.S.A. 44:10-48a. Second, the subparagraph on which A.B. relies for the proposition that the Director knows how to require continuous presence in the United States when that is what she intends provides:
(a) Only those persons who are United States citizens, or eligible aliens shall be eligible for WFNJ TANF/GA benefits. In addition, for WFNJ/GA eligibility purposes only, those persons permanently residing in the United States under color of law as of August 21, 1996 are considered eligible for WFNJ/GA benefits.
1. Eligible alien means an alien as defined in the provisions of section 431 of Title IV of Federal Public law 104-193 pursuant to section 101 of the Immigration and Nationality Act (INA) (42 U.S.C. §§ 601 and 602).
(b) The following individuals are considered to be eligible aliens:
1. An alien present in the United States prior to August 22, 1996, and who is:
i. A lawful permanent resident;
. . . .
x. An alien who obtained one of the statuses in (b)1i through ix above after August 22, 1996 if the alien was continuously present in the United States from the latest date of entry prior to August 22, 1996, until he or she obtained qualified alien status. In general, any single absence from the United States of more than 30 days, or a total of aggregated absences of more than 90 days shall be considered to interrupt continuous presence....
[N.J.A.C. 10:90-2.10.]
To the contrary, the regulation makes it abundantly clear that the regulations promulgated under the Act require that eligible aliens present in the United States before August 22, 1996, had to be LPRs before that date, which is precisely how we have construed N.J.S.A. 30:4D-3q and N.J.A.C. 10:72-3.2. The fact that benefits under WFNJ have been extended to aliens who were not admitted as LPRs before August 22, 2006, but who gained that status thereafter and have been continuously present in the United States since that date does not dictate a different result under the Act and N.J.A.C. 10:72-3.2(b). Even if it did, A.B. would not benefit from it because he has not been continuously present in the United States since before August 22, 1996.
After carefully reviewing the record in the light of the written and oral arguments advanced by the parties, we conclude that the balance of the issues presented by A.B. are without sufficient merit to warrant discussion in this opinion, R. 2:11-3(e)(1)(D), (E), and we affirm substantially for the reasons expressed by the Director in her written opinion dated October 10, 2006.
Affirmed.
NOTES
[1] NJCare "is administered by the county welfare agencies under the supervision of the Division of Medical Assistance and Health Services," N.J.A.C. 10:72-1.3, pursuant to the provision of N.J.A.C. 10:72-1.4, which requires, among other things, "strict adherence to law and complete conformity with rules and administrative policy," ibid.
[2] N.J.S.A. 30:4D-3q.