**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5654-16T2

HUDSON MANOR,

     Petitioner-Appellant,

v.

DIVISION OF AGING
SERVICES,

     Respondent-Respondent.

_____

          Submitted January 28, 2019 – Decided  February 7, 2019

          Before Judges Haas and Sumners.

          On appeal from the New Jersey Department of Human Services, Division of Aging Services.

          Pashman Stein Walder Hayden, PC, attorneys for appellant (Andrew Bayer, on the brief).

          Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raska, Assistant Attorney General, of counsel; Nicholas Logothetis, Deputy Attorney General, on the brief).

PER CURIAM

The question presented in this appeal is whether appellant Hudson Manor Health Care Center is entitled to continue to be overpaid by the State at the Medicaid reimbursement rate for Class II government-owned or operated nursing facilities even though appellant has always been a Class I privately-owned and operated facility that was never legally eligible to receive the higher Class II facility rate. Because we answer this question in the negative, we affirm the July 18, 2017 final decision of the Director of the Division of Aging that corrected the mistake that caused the overpayment.

By way of background, the Medicaid program is jointly funded by the federal and state governments. As a program participant, New Jersey is required to obtain federal approval for its "State Plan" which, among other things, describes the methodologies it will use to reimburse nursing facilities[1] and other institutions for the reasonable cost of providing care to Medicaid patients. 42 U.S.C. § 1396b; N.J.S.A. 30:4D-7. Federal approval of the State Plan enables states to receive matching federal funds for medical services provided. 42 U.S.C. § 1396b.

---

[1] "Nursing facilities" are institutions "certified by the New Jersey Department of Health and Senior Services for participation in [the Medicaid program] and primarily engaged in providing health-related care and services on a 24-hour basis to Medicaid beneficiaries[.]" N.J.A.C. 8:85-1.2.

A-5654-16T2

The New Jersey Department of Human Services, Division of Medical Assistance and Health Services, was originally responsible for managing the State's Medicaid nursing facility reimbursement program.  42 N.J.R. 1793(A).  Pursuant to Executive Reorganization Plan No. 001-1996, this responsibility was transferred to the Department of Health and Senior Services.  <u>Ibid.</u>  Effective June 29, 2012, State oversight over the setting of Medicaid rates was transferred to the Department of Human Services, Division of Aging (Division).  N.J.S.A.  30:1A-14.  On the federal side, the Centers for Medicare & Medicaid Services (CMS) within the United States Department of Health and Human Services periodically audits New Jersey's Medicaid program to ensure that it is complying with federal and State law.

In New Jersey, there are two reimbursement "rate classes" for nursing facilities. N.J.A.C. 8:85-3.3(a).  Privately-owned and operated facilities are paid at the Class I rate.  N.J.A.C. 8:85-3.3(a)(1).  "Governmental Nursing Facilities," meaning facilities that are government-owned or operated,[2] are paid the Class II rate.  The Class II rate is higher than the Class I rate.  A privately-owned and operated facility is not entitled to the higher, Class II rate.

---

[2]  The term "Governmental Nursing Facility" includes facilities owned and operated by the State, a county, or a municipality.  42 C.F.R. § 447.272(a)(1).

The State's nursing facility rate system and accompanying regulations were most recently revised in April 2011, and placed limits on how much a facility's reimbursement rate could fluctuate from year to year. N.J.A.C. 8:85-3.16(a) and (b). For State Fiscal Year 2010-2011 (FY 2011), a nursing facility's Medicaid reimbursement rate could not vary more than $5 from the rate it received on June 30, 2010. N.J.A.C. 8:85-3.16(a). This limitation was also included in the Appropriations Act for that year. L. 2010, c. 35, p. 90.

For FY 2011-2012 (FY 2012), the reimbursement rate could not vary more than $10 from the rate the facility received on June 30, 2010. N.J.A.C. 8:85-3.16(b). This limitation was also included in the Appropriations Act. L. 2011, c. 85, p. 86. While the regulations did not place a limit on a facility's reimbursement rate for FY 2012-2013 (FY 2013), the Appropriations Act for that year stated that a facility's rate could not be less than what it had received on June 30, 2012. L. 2012, c. 18, p. 103.

Turning to the present case, appellant is a private company that owns and operates a nursing facility. It purchased the facility from the County of Hudson in 2002. When the County owned and operated the facility, it was reimbursed at the Class II rate. In the contract for sale, the County agreed it would use its "best efforts to cooperate with [appellant] so that [it] continues to receive the"

4

Class II rate. However, the contract stated that "[t]his is in no way to be construed to create any guarantee on behalf of the County . . . of same."

Even though appellant should have been paid at the lower, Class I rate after the 2002 sale, the Department of Health continued to pay appellant at the higher Class II rate.[3] Thus, for the next ten years, appellant received thousands of dollars more in Medicaid reimbursement that it should have.

The Department set appellant's Medicaid reimbursement rate at $217.45[4] for FY 2011, and at $207.45 for FY 2012. Beginning July 1, 2012, appellant's rate continued to be set at $207.45.[5]

Shortly thereafter, CMS notified the Division that an audit had revealed that appellant was being paid at the Class II rate even though there was no evidence that it was a government-owned or operated nursing facility. Upon receipt of this information, the Division contacted appellant and asked if it could provide any evidence that it was owned and operated by a government entity.

---

[3] As discussed below, the Administrative Law Judge (ALJ) found that the overpayment was the result of a "mistake."

[4] The Medicaid reimbursement rate is the amount paid per patient per day.

[5] As noted above, the Division assumed responsibility for nursing facility rate setting on July 1, 2012.

A-5654-16T2

Because it was privately owned and operated, appellant was unable to demonstrate its entitlement to the higher Class II rate.

As a result, the Division corrected the reimbursement error by properly classifying appellant as a Class I facility, and resetting its rate so that it was in line with the rate paid to other similarly-situated private facilities. On December 6, 2012, the Division set appellant's new, correct rate at $194.38 effective June 30, 2012, with that new rate then continuing into FY 2012 beginning on July 1, 2012. Significantly, the Division did not seek reimbursement from appellant for all of the Medicaid funds that had been overpaid to it over the ten-year period between 2002 and 2012.

Appellant filed an administrative appeal challenging the new rate. Even though it was a privately-owned and operated facility, appellant argued that it should have continued to be paid the incorrect rate because the language in the Appropriations Acts required it be reimbursed at the same rate it received in the prior year, even though that rate had been incorrectly set. Appellant also asserted that the Division was barred by the doctrine of equitable estoppel from correcting the rate when the error was discovered by CMS.

After the Division denied appellant's Level I appeal, the matter was transmitted to the Office of Administrative Law (OAL) for hearing as a

6

contested case. N.J.A.C. 8:85-3.17(a)(1) and (2). Because there was no dispute as to any of the material facts, appellant and the Division filed cross-motions for summary decision.

On April 26, 2017, the ALJ rendered a comprehensive written Initial Decision, rejecting appellant's arguments, and concluding that the Division had properly recalculated appellant's Medicaid reimbursement rate. In so ruling, the ALJ found that the Department of Health had never made a substantive decision that appellant should be paid at the Class II rate in 2002 and, instead, the rate had been paid by mistake. The ALJ explained:

> At oral argument, [appellant] argued that the agency did not make a mistake in its prior classification as Class II. Instead, it "changed its interpretation," such that [appellant] would not be considered to be a Class I facility. However, interestingly, [appellant] does not point to any language of statute or regulation that would appear to have ever authorized the agency to classify a privately owned facility as within Class II. And while the Certifications [submitted by appellant with its motion papers] make reference to a legal authorization, [appellant] does not offer any actual legal opinion by the Attorney General to this effect. As such, it appears that the facility was accorded a status for ten years that was not authorized by statute or regulation. Why exactly it was that the rate setting agency allowed this to occur is uncertain, although [appellant] argues it was in order to facilitate the desire of Hudson County to protect the "safety-net" in the context of the transfer to private hands. Contrary to [appellant's] argument, I FIND that the continuing classification as a "Class II"

facility was not in accord with the governing statute or regulation and was a "mistake." There was no "reinterpretation" of any statute or regulation involved.

The ALJ next found that the Appropriations Acts did not bar the Division from correcting this mistake in order to ensure that appellant received the proper reimbursement rate. The ALJ stated that appellant's "reliance on the language of the Appropriations Act seems a weak branch to support its position. Surely, the intent of the language was not to freeze in place erroneous classifications and reimbursement rates calculated based upon such mistakes or misunderstandings."

In addition, the ALJ noted that the Division put appellant on notice on July 18, 2012 that its rates for that year were in doubt because it was not government-owned or operated and, in any event, appellant knew "from the very time of its negotiation of the Purchase Agreement that it was seeking treatment in a classification in which it did not fit and which the very Purchase Agreement recognized was not guaranteed."

Under these circumstances, ALJ found no basis to conclude that the Division should be equitably estopped from properly applying the governing law to set appellant's reimbursement rates at the proper level. Therefore, the ALJ

granted the Division's cross-motion for summary decision, and ruled that the $194.38 reimbursement rate was entirely appropriate.

Appellant filed exceptions to the ALJ's decision.[6] In her July 18, 2017 decision, the Division Director upheld the ALJ's determination that appellant should be paid at the proper Medicaid reimbursement rate as a Class I facility effective July 1, 2012. Like the ALJ, the Director rejected appellant's argument that the correction was barred by the Appropriations Acts. The Director stated:

> [Appellant] relies upon the Appropriations Acts to perpetuate reimbursement as a Class II facility, which it is not. The purpose of the Appropriations Act is to provide a fiscally responsible annual budget process. Burgos v. State, 222 N.J. 174, 183 (2015). The Appropriations Act is not intended to protect the improper classification of a nursing facility. Consequently, the Appropriations Act cannot be used to protect the reimbursement of a rate that is improperly based on an improper classification. . . . [The Division] adjusted only the rate for Fiscal Year 2012, not the actual reimbursement. For Fiscal Year 2013, [appellant] was not entitled to Class II status or the higher rate of reimbursement that resulted therefrom. For these reasons, I agree with the ALJ that the Appropriations Act would logically freeze only legitimate rates.

---

[6] The Division also filed exceptions, limited to the ALJ's ruling on an evidentiary issue relating to the admissibility of a certification submitted by appellant that was protected by the attorney-client privilege. However, the resolution of that issue is not material to the resolution of this appeal.

The Director also determined that appellant's equitable estoppel argument lacked merit. She found that appellant was on notice from the beginning of July 2012 that its rate for that year was under review because it was not a government-owned or operated facility. In addition, appellant was aware when it purchased the facility in 2002 that it was not entitled to the Class II rate and that the County, which had no say in the setting of the rates in any event, made no guarantee that appellant would be paid at that rate. This appeal followed.

On appeal, appellant raises the same contentions it unsuccessfully pressed before the ALJ and the Director. It again asserts that the Director arbitrarily, capriciously, and unreasonably corrected its rate in violation of the Appropriations Act, and that it should have been equitably estopped from doing so. We disagree.

Our review of an agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). "In order to reverse an agency's judgment, [we] must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [ ] not supported by substantial credible evidence in the record as a whole.'" Ibid. (second alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980)). In determining whether agency action is arbitrary, capricious, or unreasonable, our role is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of the legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [W.T. v. Div. Med. Assistance & Health Servs., 391 N.J. Super. 25, 35-36 (App. Div. 2007) (quoting Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103 (1985)).]

Thus, the burden of showing the agency acted in an arbitrary, capricious, or unreasonable manner rests on the party opposing the administrative action. E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 349 (App. Div. 2010) (citing In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006)). It is not the function of the reviewing court to substitute its independent judgment on the facts for that of an administrative agency. In re Grossman, 127 N.J. Super. 13, 23 (App. Div. 1974).

We must also "'defer to an agency's technical expertise, its superior knowledge of its subject matter area, and its fact-finding role,'" and therefore are "obliged to accept all factual findings that are supported by sufficient credible evidence." Futterman v. Bd. of Review, Dept. of Labor, 421 N.J. Super. 281, 287 (App. Div. 2011) (quoting Messick v. Bd. of Review, 420 N.J. Super.

11

321, 325 (App. Div. 2011)). Although we are not bound by an agency's interpretation of law, we accord a degree of deference when the agency interprets a statute or a regulation that falls "within its implementing and enforcing responsibility[.]" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001). Our authority to intervene is limited to "those rare circumstances in which an agency action is clearly inconsistent with the agency's statutory mission or with other State policy." Futterman, 421 N.J. Super. at 287.

Furthermore, "[i]t is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" E.S., 412 N.J. Super. at 355 (second alteration in original) (quoting Wnuck, 337 N.J. Super. at 56). "Nevertheless, 'we are not bound by the agency's legal opinions.'" A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 340 (App. Div. (2009) (quoting Levine v. State Dep't of Transp., 338 N.J. Super. 28, 32 (App. Div. 2001))). "Statutory and regulatory construction is a purely legal issue subject to our de novo review." Ibid. (citation omitted).

Applying these principles, we discern no basis for disturbing the Division Director's reasonable determination that appellant's Medicaid reimbursement

rate had to be corrected as soon as the mistake was discovered by CMS. We therefore affirm substantially for the reasons set forth in the Director's comprehensive written decision, and add the following comments.

We agree with the Director that the language in the Appropriations Acts placing limits on the amount a nursing facility's rate could vary from year to year only applied to rates that had been correctly established in accordance with law. It is well settled that "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good direction.'" DeLisa v. Cnty. of Bergen, 165 N.J. 140, 147 (2000) (quoting Schierstead v. City of Brigantine, 29 N.J. 220, 230 (1959)). Thus,

> [i]n reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter. This doctrine permeates our case law.
>
> [N.J. Builders, Owners & Managers Ass'n, 60 N.J. 330, 338 (1972).]

In short, "common sense should not be abandoned in interpreting a statute[.]" A.B., 407 N.J. Super. at 341. "[W]here a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law

13

A-5654-16T2

should control." Ibid. (quoting Turner v. First Union Nat'l Bank, 162 N.J. 75, 84 (1999)).

Here, the overriding public purpose behind any Appropriations Act is to ensure that the State's limited funds are spent in a fiscally responsible manner. Burgos, 222 N.J. at 183. Yet, appellant would have us read the language in the Acts to mandate the continued payment of an incorrect Medicaid reimbursement rate that is higher than that permitted by law. To maintain appellant's Class II rate when it has always been a privately-owned Class I facility would contravene the regulatory scheme and be a fiscally irresponsible use of State and federal Medicaid funds. Because appellant's interpretation would lead to the absurd result of continuing reimbursement at an improper rate to which it was never entitled, we reject its contention on this point.

Appellant's equitable estoppel argument is equally unavailing. "Equitable estoppel is 'rarely invoked against a governmental entity[,]'" Middletown Twp. Policemen's Benevolent Ass'n Local No. 124 v. Twp. of Middletown, 162 N.J. 361, 367 (2000) (quoting Wood v. Borough of Wildwood Crest, 319 N.J. Super. 650, 656 (App. Div. 1999)), particularly when estoppel would interfere with "essential governmental functions[.]" Vogt v. Borough of Belmar, 14 N.J. 195, 205 (1954). The doctrine of equitable estoppel requires proof of

a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his [or her] position for the worse[.]

[Carlsen v. Masters, Mates & Pilots Pension Plan Tr., 80 N.J. 334, 339 (1979).]

The reliance must be "reasonable and justifiable" and the burden of proof is on the party asserting the estoppel. Foley Mach. Co. v. Amland Contractors, Inc., 209 N.J. Super. 70, 75-76 (App. Div. 1986).

Appellant cannot meet these requirements. The State was not a party to its contract with the County when it purchased its facility, and the State made no misrepresentations to appellant concerning its Medicaid reimbursement rates. Appellant obviously knew it was privately owned, and should have been paid at the Class I rate like all other similar facilities. When the mistake was discovered by the CMS, the Division properly corrected it to ensure that going forward, appellant received only the payments permitted by law.[7]

---

[7] We again note that the Division has not sought to recover the payments that appellant incorrectly received during the ten-year period between 2002 and 2012.

Nothing in the circumstances of this case estopped the Division from taking that required, regulatory action, and its decision was clearly not arbitrary, capricious, or unreasonable. Therefore, we reject appellant's contention on this point.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16                                                                      A-5654-16T2