74 A.3d 931

MANUEL GUAMAN, MARIA GUAMAN, NADIA CHERY, DEYINI-RA VALENZUELA, ROSA RODRIGUEZ AND KEITHION BLAKE, PLAINTIFFS–APPELLANTS, v. JENNIFER VELEZ, COMMISSIONER OF NEW JERSEY DEPARTMENT OF HUMAN SERVICES AND JOHN GUHL, DIRECTOR OF MEDICAL ASSISTANCE AND HEALTH SERVICES, DEFENDANTS–RESPONDENTS.[1]

Superior Court of New Jersey
Appellate Division

Argued January 8, 2013[2]—Decided August 13, 2013.

---

[1] On September 30, 2010, Judge Feinberg signed a consent order (L–1608–10) transferring the case to the Appellate Division pursuant to *Rule* 1:13–4 on the basis that the appellate court had jurisdiction under *Rule* 2:2–3(a)(2).

[2] After the case was argued, we requested supplemental materials from the parties, which they submitted on August 1, 2013.

Before Judges REISNER, YANNOTTI, and HARRIS.

*Jennifer B. Condon* argued the cause for appellants (*Seton Hall University School of Law Center for Social Justice and Gibbons, P.C.*, attorneys; *Lawrence S. Lustberg*, of counsel and on the brief; *Ms. Condon* and *Rachel Lopez*, on the brief).

*Melissa H. Raksa*, Assistant Attorney General, argued the cause for respondents (*Jeffrey S. Chiesa*, Attorney General, attorney; *Ms. Raksa*, of counsel and on the brief; *Dianna Rosenheim*, Deputy Attorney General, on the brief).

*Judah Skoff* argued the cause for amicus curiae New Jersey Appleseed Public Interest Law Center; New Jersey Policy Perspective; New Jersey Citizen Action; State Parent Advocacy Network; Family Voices of New Jersey; Next Step; New Jersey Working Families Alliance; Blue Wave; South Jersey Chapter of the National Organization of Women; The Unitarian Universalist Legislative Ministry of New Jersey; The Lutheran Office of Governmental Ministry in New Jersey; Latino Action Network; and Democracia (*McCarter & English, LLP*, attorneys; *John C. Kelly* and *Mr. Skoff*, of counsel and on the brief).

*Ronald K. Chen* argued the cause for amicus curiae American Civil Liberties Union of New Jersey (*Rutgers Constitutional Litigation Clinic Center for Law & Justice*, attorney; *Mr. Chen*, on the brief).

The opinion of the court was delivered by

REISNER, P.J.A.D.

The issue in this case is whether, consistent with the United States Constitution and the New Jersey Constitution, the State may eliminate state-funded Medicaid benefits for adult legal permanent resident aliens who do not qualify for federally-funded Medicaid benefits, i.e., adult legal aliens who do not meet the federal five-year residency requirement set forth in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 8 *U.S.C.A.* § 1601 to 1646.[3] In a prior opinion

---

[3] To more precisely delineate the group of resident aliens that constitute the plaintiff class, they are the non-pregnant adult parents of children who qualify for the NJFamily Care program. NJFamily Care provides subsidized health insurance for impoverished children and their parents, as well as for impoverished pregnant women, under several plans underwritten by Title XIX (Medicaid) and Title XXI (SCHIP). *See N.J.S.A.* 30:4J–8 ("Family Health Care Coverage Act"); *N.J.A.C.* 10:49–1.3 (defining plans); *see also S.J. v. Div. of Med. Assist. & Health Servs.*, 426 *N.J.Super.* 366, 374–75, 44 *A.3d* 643 (App.Div.) (discussing plans), *certif. denied*, 212 *N.J.* 461, 56 *A.3d* 395 (2012). At one time, the program also provided coverage for some impoverished, childless adults. *See N.J.S.A.* 30:4J–1 to –4 (repealed 2005). In 2010, the State eliminated funding for, and barred participation by, non-qualifying resident aliens who were the adult non-pregnant parents of participating children. *N.J.A.C.* 10:78–3.2(e). The State continued to allow participation by resident alien children and pregnant women, because, by 2009, the federal government had extended Medicaid coverage for those groups regardless of their length of residency, and hence their participation was subsidized by federal funds. *See* 42 *U.S.C.A.* § 1396b(v)(4)(A) (CHIPRA). In addition to dropping coverage for non-pregnant adult alien parents who could not meet the five-year residency requirement, the State closed the program to any new applicants—resident aliens or citizens—whose participation would not be subsidized by federal funding. *N.J.A.C.* 10:78–1.1(a). The excluded group included parents with incomes higher than 133% of the federal poverty level, as well as impoverished, childless adults. *N.J.S.A.* 30:4J–9f. The State had previously subsidized their participation, with no federal subsidies, but concluded that due to a fiscal crisis it could no longer afford to do so. As of July

denying plaintiffs' application for preliminary injunctive relief, we found they were unlikely to prevail on the merits of their constitutional claims. *Guaman v. Velez,* 421 *N.J.Super.* 239, 23 *A.*3d 451 (App.Div.2011) *(Guaman I ).* We agree with the legal analysis in *Guaman I,* and this opinion is intended to be read together with *Guaman I.* Based on that analysis, and the additional reasoning set forth in this opinion, we conclude that the State's action is consistent with both the Federal and State Constitutions, and we affirm.[4]

The State's limitation on benefits to aliens is based on PRWORA, which imposed a five-year residency requirement before most permanent legal aliens could qualify for Medicaid. The federal limits were succinctly described in *A.B. v. Div. of Medical Assist. & Health Servs.,* 407 *N.J.Super.* 330, 343, 971 *A.*2d 403 (App.Div.), *certif. denied,* 200 *N.J.* 210, 976 *A.*2d 386 (2009): [5]

> In 1996, Congress enacted legislation that had a profound effect upon aliens' access to medical benefits. [PRWORA] was designed to reduce the impact of "aliens . . . applying for and receiving public benefits from Federal, State, and local governments at increasing rates." 8 *U.S.C.A.* § 1601(3). PRWORA "imposes several limitations on the availability of Medicaid benefits to aliens." *Soskin v. Reinertson,* 353 *F.*3d 1242, 1245–46 (10th Cir.2004).
>
> There are two classes of aliens: "qualified aliens" and "unqualified aliens." The definition of "qualified aliens" includes, among others, aliens who were "lawfully admitted for permanent residence under the Immigration and Nationality Act." 8 *U.S.C.A.* § 1641(b)(1)-(4). "Unqualified aliens" are all aliens who do not fall within the definition of "qualified aliens." *Id.* at § 1611(a). Only qualified aliens are eligible for most federal means-tested public benefits. *Soskin, supra,* 353 *F.*3d at 1245; 8 *U.S.C.A.* § 1611(a).

2010, the Division "extended medical coverage" to restricted aliens still enrolled in the NJFamily Care program who were being treated for life-threatening medical conditions, regardless of their length of U.S. residency. *N.J.A.C.* 10:78–3.2(e)(2).

[4] Appellants have abandoned the statutory and regulatory arguments they initially raised on this appeal. Therefore, we will not address those issues.

[5] *A.B.* primarily involved statutory interpretation. That opinion rejected without discussion A.B.'s argument that interpreting State law to disqualify him for NJCare benefits would violate the "federal Equal Protection Clause." *Id.* at 338, 971 *A.*2d 403.

Qualified aliens entering the United States on or after August 22, 1996, are "not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien's entry into the United States," 8 *U.S.C.A.* § 1613(a), unless they were receiving benefits as of that date, in which case the states were required to continue their benefits until January 1, 1997, *id.* at § 1612(b)(2)(D).

As we summarized in *Guaman I, supra,* 421 *N.J.Super.* at 250, 23 *A.*3d 451 the State initially responded to PRWORA by excluding legal aliens from the Medicaid program unless they satisfied the Federal five-year residency requirement. *See N.J.S.A.* 30:4D–3; *L.* 1997, *c.* 352; Assembly Appropriations Committee Statement to Senate Bill No. 2170. The State expanded coverage in 2005 to delete the five-year requirement, based on the Legislature's findings that limiting State subsidized healthcare coverage had resulted in increased costs for emergency hospital charity care. *Id.* at 251, 23 *A.*3d 451; *N.J.S.A.* 30:4J–9e.

In 2010, in response to a budget crisis, the State reinstated the five-year residency requirement for most adult legal aliens. However, the State continued to provide coverage for legal aliens who were pregnant women or children under the age of nineteen, and existing enrollees who were receiving treatment for life threatening illnesses or were receiving on-going life sustaining treatment. As part of the economic cut-backs, the State also closed the NJ Familycare program to all adults "whose benefits are not funded or payable under Title XIX of the Social Security Act." *N.J.A.C.* 10:78–1.1(a).

In *Guaman I,* we recognized that ordinarily, alienage is a suspect classification, and discrimination against aliens must be justified under a strict scrutiny standard of review. *Guaman I, supra,* 421 *N.J.Super.* at 262, 23 *A.*3d 451. However, we also acknowledged that due to Congress's broad constitutional power over immigration, the rational basis standard of review applies to Congressional enactments affecting immigrants, and to State enactments authorized by a uniform federal policy:

Even though lawful immigrants comprise a suspect class otherwise triggering strict scrutiny analysis, the Supreme Court applies a dichotomized standard of review. Because of the federal government's plenary power to regulate immigration,

classifications based on alienage in federal programs are subject to rational basis review. *Mathews v. Diaz,* 426 *U.S.* 67, 85–87, 96 *S.Ct.* 1883, 1894–95, 48 *L.Ed.*2d 478, 493–94 (1976). Because the states lack plenary power over immigration policy, similar classifications in a State's benefits programs are subject to strict scrutiny. [*Graham v. Richardson,* 403 *U.S.* 365, 376, 91 *S.Ct.* 1848, 1854, 29 *L.Ed.*2d 534, 544 (1971).]

Therefore, despite the federal government's broad power over immigration and naturalization, *"Congress does not have the power to authorize the individual States to violate the Federal Equal Protection Clause." Graham, supra,* 403 *U.S.* at 382, 91 *S.Ct.* at 1857, 29 *L.Ed.*2d at 548 (emphasis added); . . . . However, "if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction." *Plyler, supra,* 457 *U.S.* at 219 n. 19, 102 *S.Ct.* at 2396 n. 19, 72 *L.Ed.*2d at 800–01 n. 19 (citing *De Canas v. Bica,* 424 *U.S.* 351, 96 *S.Ct.* 933, 47 *L.Ed.*2d 43 (1976)).

[*Id.* at 262–63, 23 *A.*3d 451 (quoting *Plyler v. Doe,* 457 *U.S.* 202, 102 *S.Ct.* 2382, 72 *L.Ed.*2d 786 (1982)).]

Noting the difficulty in determining whether Congress had adopted a "uniform policy" with respect to the five-year eligibility requirement, we nonetheless were persuaded that the State scheme was likely to pass constitutional muster. We found convincing the rationale expressed in *Soskin v. Reinertson,* 353 *F.*3d 1242 (10th Cir.2004):

[I]n *Soskin v. Reinertson,* [*supra,* 353 *F.*3d at 1244] the court applied a rational basis standard in reviewing equal protection challenges to a Colorado law that repealed jointly funded Medicaid coverage to otherwise legal aliens. The *Soskin* court determined that that case fell somewhere between *Graham* and *Mathews,* because unlike the state statute at issue in *Graham,* PRWORA provided specific Congressional authorization for the state's action, and unlike *Mathews,* it involved a state-administered program. *Id.* at 1255. The court noted:

Some benefits for aliens are required, some are prohibited. In between, the states are permitted to be more restrictive (or, depending on one's point of view, more generous). Relying on *Graham,* one could say, as Plaintiffs do, that when a state elects not to provide aliens with the maximum benefits permitted by federal law, it is discriminating against aliens and the federal government's imprimatur for such discrimination cannot reduce the level of scrutiny to which the state's choice is subjected under the Equal Protection Clause. . . .

We do not share that view. The reason for applying rational-basis review to federal law regarding aliens is that such laws reflect national policy that Congress has the constitutional power to enact. Once Congress has expressed that policy, the courts must be deferential. What Plaintiffs fail to consider is that a state's exercise of discretion can also effectuate national policy. Recall that the PRWORA does not give the states unfettered discretion. Some coverage must be provided to aliens; some coverage is forbidden. State

discretion is limited to the remaining optional range of coverage. In exercising that discretion each state is to make its own assessment of whether it can bear the burden of providing any optional coverage. When a state determines that the burden is too high and decides against optional coverage, it is addressing the Congressional concern (not just a parochial state concern) that "individual aliens not burden the public benefits system." 8 *U.S.C.A.* § 1601(4). This may be bad policy, but it is Congressional policy; and we review it only to determine whether it is rational.

[*Id.* at 264-65, 23 *A.*3d 451 (quoting *Soskin, supra,* 353 *F.*3d at 1244) (additional citations omitted).]

After reviewing the conflicting decisions from the courts of other states, we concluded that *Soskin* was persuasive:

Given the Federal goals explicitly stated in PRWORA, and the complicated nature of the funding for the FamilyCare program that implicates Federal and State resources, we find the court's reasoning in *Soskin, supra,* 353 *F.*3d at 1255, that the appropriate standard of review lies somewhere between *Graham* and *Mathews,* to be compelling. FamilyCare is a state program created to provide subsidized health insurance coverage to low-income children, their parents, and other adults whose family incomes are too high for them to be eligible for traditional Medicaid. The program is jointly funded by the state and federal government. NJ FamilyCare, http://www.njfamilycare.org/ (last visited June 23, 2011). Lawful permanent residents, otherwise eligible for Medicaid but for the five-year bar, were eligible for coverage under FamilyCare, but only with the use of state funds. *N.J.A.C.* 10:78-1.1. Within the complex funding structure, defendants have now chosen to impose an eligibility requirement for state-funded benefits which directly conforms to federal requirements, 8 *U.S.C.A.* § 1613(a), and has been upheld by the federal courts. *See, e.g., Mathews, supra,* 426 *U.S.* at 69, 96 *S.Ct.* at 1886, 48 *L.Ed.*2d at 484. We have upheld the five-year bar in other jointly-funded, state-administered Medicaid programs. *A.B., supra,* 407 *N.J.Super.* at 349-50 [971 *A.*2d 403]. The adoption of the federal five-year eligibility bar in the state program, while not mandated, mirrors federal objectives, corresponds to an identifiable congressional policy, and "operate[s] harmoniously" within the federal program. *Plyler, supra,* 457 *U.S.* at 226, 102 *S.Ct.* at 2399, 72 *L.Ed.*2d at 805; *see Sudomir v. McMahon,* 767 *F.*2d 1456, 1466 (9th Cir.1985) ("It would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution impels the states to refrain from adhering to the federal guidelines.").

We conclude, therefore, that plaintiffs are not likely to succeed on their equal protection claims under the United States Constitution.

[*Id.* at 266-67, 23 *A.*3d 451.]

We were likewise unpersuaded by plaintiffs' arguments premised on the State Constitution:

In analyzing equal protection challenges under the state constitution, our courts have rejected the federal multi-tiered analysis (strict scrutiny, intermediate scruti-

ny, rational basis), and employ a more flexible balancing test that considers three factors: "(1) the nature of the right asserted; (2) the extent to which the statute intrudes upon that right; and (3) the public need for the intrusion." Although the federal and state tests are different, they "weigh the same factors and often produce the same result."

Here, the means selected by defendants—adopting the federal eligibility criteria for aliens—bears a real and substantial relationship to PRWORA's "compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy," and New Jersey's interest in providing subsidized health insurance within the limits of the appropriations as set forth in the enabling act. *N.J.S.A.* 30:4J–16. We conclude that under the more flexible standard of review applied to plaintiffs' state constitutional claims, they are unlikely to succeed on the merits of their complaint.

[*Id.* at 267–68, 23 *A.*3d 451 (citations omitted).]

 Without unnecessarily plowing over the same ground we covered in *Guaman I,* we return to *Mathews v. Diaz,* 426 *U.S.* 67, 96 *S.Ct.* 1883, 48 *L.Ed.*2d 478 (1976), and some newer cases that we deem pertinent. *Mathews* reminds us, in powerful language, of the deference due Congress's authority over immigration-related benefit issues. *Mathews* addressed a Federal statute that created a uniform residency requirement for aliens applying for the Medicare Part B supplemental medical insurance program. The plaintiffs challenged "42 *U.S.C.* § 1395*o* (2) (1970 ed., Supp. IV), which grants eligibility to resident citizens who are 65 or older but denies eligibility to comparable aliens unless they have been admitted for permanent residence and also have resided in the United States for at least five years." *Id.* at 69, 96 *S.Ct.* 1883. In that context, the Court addressed "whether Congress may discriminate in favor of citizens and against aliens in providing welfare benefits." *Id.* at 74, 96 *S.Ct.* 1883.

The Court began by reviewing the many permissible ways in which aliens may lawfully be treated differently than citizens.

In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry. The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is "invidious."

[*Id.* at 79–80, 96 *S.Ct.* 1883 (footnotes omitted).]

The Court then considered Congress's broad power to differentiate between classes of aliens in determining how to distribute welfare benefits:

> In particular, the fact that Congress has provided some welfare benefits for citizens does not require it to provide like benefits for all aliens. Neither the overnight visitor, the unfriendly agent of a hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and some of its guests. The decision to share that bounty with our guests may take into account the character of the relationship between the alien and this country: Congress may decide that as the alien's tie grows stronger, so does the strength of his claim to an equal share of that munificence.
>
> The real question presented by this case is not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination within the class of aliens—allowing benefits to some aliens but not to others—is permissible. We turn to that question.
>
> [*Id.* at 80, 96 *S.Ct.* 1883.]

The Court went on to consider the important national and international repercussions of federal immigration decisions and the reluctance with which courts should interfere in clearly-articulated federal immigration policies:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.
>
> [*Id.* at 81–82, 96 *S.Ct.* 1883 (footnotes omitted).]

The Court noted that the potential consequence of deciding the case adversely to the federal government would be a requirement that the government extend Medicare benefits to a huge additional pool of immigrants. *Id.* at 81 n. 20, 96 *S.Ct.* 1883.

Further, the Court accepted as a given that some form of residency requirement was appropriate in deciding which aliens would qualify for welfare benefits:

Since it is obvious that Congress has no constitutional duty to provide all aliens with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others. In this case the appellees have challenged two requirements—first, that the alien be admitted as a permanent resident, and, second, that his residence be of a duration of at least five years. But if these requirements were eliminated, surely Congress would at least require that the alien's entry be lawful; *even then, unless mere transients are to be held constitutionally entitled to benefits, some durational requirement would certainly be appropriate. In short, it is unquestionably reasonable for Congress to make an alien's eligibility depend on both the character and the duration of his residence.* Since neither requirement is wholly irrational, this case essentially involves nothing more than a claim that it would have been more reasonable for Congress to select somewhat different requirements of the same kind.

We may assume that the five-year line drawn by Congress is longer than necessary to protect the fiscal integrity of the program. We may also assume that unnecessary hardship is incurred by persons just short of qualifying. But it remains true that some line is essential, that any line must produce some harsh and apparently arbitrary consequences, and, of greatest importance, that those who qualify under the test Congress has chosen may reasonably be presumed to have a greater affinity with the United States than those who do not. In short, citizens and those who are most like citizens qualify. Those who are less like citizens do not. [*Id.* at 82–83, 96 *S.Ct.* 1883 (footnote omitted) (emphasis added).]

We next return to our consideration of *Plyler v. Doe, supra.* In *Plyler,* the Court suggested that, in treating aliens differently than citizens, the States may follow a uniform rule created by Congress:

With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power. But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction. *See De Canas v. Bica,* 424 *U.S.* 351 [96 *S.Ct.* 933, 47 *L.Ed.*2d 43] (1976). [*Plyler, supra,* 457 *U.S.* at 219 n. 19, 102 *S.Ct.* at 2396 n. 19, 72 *L.Ed.*2d at 800 n. 19.]

In *Plyler,* the Court searched for any Congressional policy authorizing the Texas law excluding undocumented alien children from attending the public schools, and found none. "Faced with an equal protection challenge respecting the treatment of aliens, we agree that the courts must be attentive to congressional policy;

the exercise of congressional power might well affect the State's prerogatives to afford differential treatment to a particular class of aliens. But we are unable to find in the congressional immigration scheme any statement of policy that might weigh significantly in arriving at an equal protection balance concerning the State's authority to deprive these children of an education." *Id.* at 224–25, 102 *S.Ct.* 2382. The Court elaborated on that finding:

> [T]here is no indication that the disability imposed by § 21.031 corresponds to any identifiable congressional policy. The State does not claim that the conservation of state educational resources was ever a congressional concern in restricting immigration. More importantly, the classification reflected in § 21.031 does not operate harmoniously within the federal program.
>
> [*Id.* at 225–26, 102 *S.Ct.* 2382.]

In *Toll v. Moreno,* 458 *U.S.* 1, 102 *S.Ct.* 2977, 73 *L.Ed.*2d 563 (1982), the Court further refined its interpretation of *Graham, supra,* in the course of invalidating a State restriction on in-State tuition for the children of certain aliens. Harmonizing *Graham* with *Takahashi v. Fish & Game Comm'n,* 334 *U.S.* 410, 68 *S.Ct.* 1138, 92 *L.Ed.* 1478 (1948), which invalidated a State law denying fishing licenses to aliens, the Court explained that the tuition restriction was invalid because it placed on aliens a burden not authorized by Congress, and therefore violated the Supremacy Clause.[6] *Toll, supra,* 458 *U.S.* at 17, 102 *S.Ct.* at 2986, 73 *L.Ed.*2d at 576.

> The decision in *Graham v. Richardson, supra,* followed directly from *Takahashi.* In *Graham* we held that a State may not withhold welfare benefits from resident aliens "merely because of their alienage." 403 *U.S.* at 378 [91 *S.Ct.* 1848]. Such discrimination, the Court concluded, would not only violate the Equal Protection Clause, but would also encroach upon federal authority over lawfully admitted aliens. In support of the latter conclusion, the Court noted that Congress had "not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States," *id.* at 377 [91 *S.Ct.* 1848], but rather had chosen to afford "lawfully admitted resident aliens ... the full and equal benefit of all state laws for the security of persons and property," *id.* at 378 [91 *S.Ct.* 1848]. The

---

[6] In a footnote, the Court declined to address "a State's imposition of a burden on all individuals sharing a common relevant characteristic, of whom only some are aliens." *Id.* at 17 n. 25, 971 *A.*2d 403.

States had thus imposed an "auxiliary [burden] upon the entrance or residence of aliens" that was never contemplated by Congress. *Id.* at 379 [91 *S.Ct.* 1848].

Read together, *Takahashi* and *Graham* stand for the broad principle that "state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress." *De Canas v. Bica,* 424 *U.S.* 351, 358, n. 6, 96 *S.Ct.* 933.

[*Id.* at 12–13, 102 *S.Ct.* 2977 (footnote omitted).]

Dicta in the Supreme Court's most recent pronouncement on Congress's immigration powers also touches on this issue. In describing the breadth of Congressional authority, Justice Kennedy cited PRWORA in stating:

Federal governance of immigration and alien status is extensive and complex. Congress has specified categories of aliens who may not be admitted to the United States. *See* 8 *U.S.C.* § 1182. Unlawful entry and unlawful reentry into the country are federal offenses. §§ 1325, 1326. Once here, aliens are required to register with the Federal Government and to carry proof of status on their person. *See* §§ 1301–1306. Failure to do so is a federal misdemeanor. §§ 1304(e), 1306(a). *Federal law also authorizes States to deny noncitizens a range of public benefits, § 1622;* and it imposes sanctions on employers who hire unauthorized workers, § 1324a.

[*Arizona v. United States,* —— *U.S.* ——, ——, 132 *S.Ct.* 2492, 2499, 183 *L.Ed.*2d 351, 366 (2012) (emphasis added).]

Notably, the emphasized language reads "authorizes" not "requires." *Ibid.*

We recognize that in a number of post-*Mathews* cases, the Supreme Court invalidated state laws that limited benefits for aliens. *See, e.g., Nyquist v. Mauclet,* 432 *U.S.* 1, 97 *S.Ct.* 2120, 53 *L.Ed.*2d 63 (1977). But none of those cases involved such an unmistakably clear and powerful statement of Congressional immigration policy to support the challenged state laws.

In light of the case law since *Mathews,* we believe it appropriate to give some further consideration to the "uniform rule" doctrine. We begin by looking afresh at what Congress said in PRWORA and what Congress was evidently trying to accomplish in that legislation.

The most critical section of PRWORA begins with a powerful and specific statement of Congress's concerns about the impact of

immigration on the public fisc. It closes by describing state action in legalistic terms, obviously aimed at establishing that PRWORA embodies a critically important national policy and, therefore, that state statutes consistent with PRWORA should be deemed valid:

§ 1601. Statements of national policy concerning welfare and immigration.

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this title, *a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest* of assuring that aliens be self-reliant in accordance with national immigration policy.

[8 *U.S.C.A.* § 1601 (emphasis added).]

Arguably, the language Congress chose in subparagraph (7) was insensitive to separation-of-powers concerns. Nonetheless, stripped of legalese, subparagraph 7 expresses Congress's finding that when a state chooses to follow Congress's lead on this issue, by denying public benefits to legal aliens who have been in this country less than five years, it is furthering a very important national immigration policy. The issue is whether this statement of national policy, viewed pragmatically in light of the overall

structure of Medicaid, is sufficiently "uniform" to constitutionally authorize states to follow Congress's policy choice.

In some portions of PRWORA, Congress exercised the heavy hand of mandate, by prohibiting states from providing aliens with certain types of benefits. However, with respect to other types of benefits—notably, access to low-cost or no-cost health benefits—Congress chose the less heavy-handed approach of fiscal disincentives. *See Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, ——, 132 *S.Ct.* 2566, 2579, 183 *L.Ed.*2d 450, 466 (2012); *South Dakota v. Dole,* 483 *U.S.* 203, 205–06, 107 *S.Ct.* 2793, 2795, 97 *L.Ed.*2d 171, 176–77 (1987). Thus, states choosing to extend health benefits to aliens who would not qualify under the Federal scheme, must do so entirely at their own expense.

There appears no question that Congress could absolutely and uniformly prohibit the States from providing these health benefits to legal aliens, as a matter of national immigration policy. The question before us is whether Congress's choice to use the less drastic approach of fiscal disincentives, rather than the sledgehammer of absolute prohibition, to impose its will on the States, should produce a different constitutional result. Putting the question another way, may Congress create a national immigration policy, one aspect of which allows the States some leeway in its implementation?

Answering this question involves looking at the broader picture of the Medicaid system. When Congress decreases federal funding to the States for Medicaid and related programs providing healthcare to low income persons, it places the States in the following financial bind. Federal Medicaid law requires the States to provide emergency healthcare to indigent persons, regardless of their immigration status or whether they otherwise qualify for any other form of Medicaid assistance. Because the Federal Medicaid law requires the States to provide emergency medical care "to all individuals in need of such services," 8 *U.S.C.A.* § 1611(b)(1)(A), cutting Federal Medicaid funding for legal aliens does not address the State-level fiscal problem posed by uninsured persons seeking

urgently-needed health care in hospital emergency rooms. Our Legislature recognized, in *N.J.S.A.* 30:4J–9e, that reducing health-care coverage for low-income persons results in increased expenditures for charity care in hospital emergency rooms. Consequently, as a practical matter, states can either fund healthcare for the poor on the "front end" by providing them with some form of subsidized healthcare coverage, or pay on the "back end" in increased costs for hospital charity care. That choice may be driven by a state's current economic situation, e.g., whether it can afford to "front load" healthcare costs or whether it prefers to bear higher costs in the future when its budget situation may be less dire.

In turn, this paradigm may explain why Congress left the States some discretion to fund healthcare coverage for non-qualifying aliens, rather than absolutely prohibiting them from doing so.[7] Congress's choice to structure the Medicaid program in this way does not necessarily mean it has created a "non-uniform" system. As *Soskin* recognized, the uniform rule Congress has created must be viewed through a broad lens: Congress has expressed a very strong preference that resident aliens be self-sufficient and that this self-sufficiency should include obtaining their own healthcare coverage rather than relying on State or Federal Medicaid or Medicaid-like benefits. When the States follow that policy, by declining to fund coverage for aliens, they are implementing Congress's choice. In particular, when States conclude that they cannot afford those expenditures, they are implementing Congress's choice that recent immigrants should not unduly burden the public fisc. *See Soskin, supra,* 353 *F.*3d at 1244.[8]

---

[7] Indeed, plaintiffs' brief cites to discussions in the Congressional Record in which a number of senators argued that in drastically limiting Medicaid and welfare benefits for immigrants, Congress would be shifting significant expenses to the States. *See, e.g.,* 141 *Cong. Rec.* S 13581 (daily ed. Sept. 14, 1995).

[8] The Federal Patient Protection and Affordable Care Act (Affordable Care Act) may, to some extent, ameliorate this problem by making many resident aliens eligible for federal subsidies toward the cost of purchasing private health

Plaintiffs, joined by amici curiae, argue that this policy is fiscally short-sighted, inhumane, and unfairly singles out a group—legal resident aliens—that overall makes a major contribution to our nation's economy. However, to articulate these contentions is to identify them for what they are—policy arguments that should be addressed to Congress. Regardless of our view of the federal law, it is not our role to judge its wisdom.

■ We conclude that when Congress, in the exercise of its Constitutional power over immigration, cuts off Medicaid funding for a group of aliens, the States cannot be required to restore that coverage using solely State funds. In general, the State may limit eligibility for Medicaid-related programs to only those persons whose participation is supported by federal funding. *See Hong Pham v. Starkowski*, 300 *Conn.* 412, 16 *A.*3d 635, 646 (2011) ("[T]he equal protection clause does not require the states to 'fill the gap' in coverage for the class members that the federal government had created under the Welfare Reform Act."); *Doe v. Comm'r of Transitional Assistance*, 437 *Mass.* 521, 773 *N.E.*2d 404 (2002).

The fact that the ineligible group in this case includes legal resident aliens does not change the result. They are ineligible because the State has elected to follow a policy that Congress was constitutionally permitted to establish. Plaintiffs' analogy to discrimination against women and racial minorities is inapt here. In

insurance. *P.L.* 111–148 (2010), as amended by *P.L.* 111–152 (2010) (codified as amended in scattered sections of 42 *U.S.C.A.*). The subsidies are available to both citizens and aliens who are employed, with no residency restrictions. *See* Congressional Research Service, *Treatment of Noncitizens Under the Patient Protection and Affordable Care Act* (March 22, 2011); New Jersey FY 2014 Appropriations Act, *L.* 2013, *c.* 77, S. 3000 at p. 101 (transferring NJFamily Care enrollees to coverage under the Affordable Care Act when its relevant provisions take effect). However, in passing the Affordable Care Act, Congress did not change PRWORA's five-year residency requirement for legal aliens' eligibility for Medicaid. *Treatment of Noncitizens, supra.* Hence, it seems clear that the five-year Medicaid eligibility requirement continues to represent a strong federal policy.

regard to Congress's power to deny benefits, aliens are not analogous to women or racial minorities, because the United States Constitution substantially limits the extent to which Congress may draw distinctions regarding the latter groups. By contrast, Congress does have wide-ranging authority to treat aliens differently than citizens, in the exercise of its constitutional power over immigration. Moreover, there is no dispute that the State chose to exclude legal resident aliens from the NJFamily Care program solely for financial reasons, and not for any invidious discriminatory purpose.[9]

Plaintiffs argue that the State may not constitutionally allow existing non-federally-funded citizens and a small group of aliens with serious illnesses to remain in the NJFamily Care Program, while terminating plaintiffs' participation and refusing to allow new applicants in the program. We cannot agree. We conclude that this State action was likewise authorized by PRWORA and fell within the umbrella of the uniform policies articulated in § 1601 of PRWORA.

We find unpersuasive the distinction some courts have recognized between the creation and then elimination of "alien-only" benefit programs, versus the inclusion, and then exclusion, of aliens from unitary programs that provided benefits to both citizens and aliens. In our view, Congress either has the constitutional power to authorize the States to treat aliens differently for purposes of benefit programs or it does not, and likewise, the States either have the authority to follow Congress's clearly-stated immigration policy or they do not. The constitutionality of a State's action in this field should not depend on whether it has

---

9 For that reason, plaintiffs' citation of *Right to Choose v. Byrne*, 91 *N.J.* 287, 450 *A.2d* 925 (1982), is not persuasive. In that case, the restriction on Medicaid funding for health-required abortions had no rational fiscal justification and was transparently aimed at burdening women's access to a particular medical procedure protected under our State Constitution.

first created a separate-but-equal (or somewhat unequal) program for aliens.[10]

We conclude that the Federal Equal Protection Clause does not bar a State from acting consistent with the clearly-expressed federal policy, embodied in PRWORA, to deny Medicaid benefits to legal aliens who do not meet the federal residency requirement. Even if the State responds reluctantly and only partially to the economic disincentives created in PRWORA, to the extent it does follow those disincentives, it is implementing the will of Congress. We also conclude that undermining Congress's authority to create uniform but flexible rules limiting social welfare benefits to immigrants could interfere with its future ability to mold national immigration policy. *See Mathews, supra,* 426 *U.S.* at 81 n. 20, 96 *S.Ct.* at 1892 n. 20, 48 *L.Ed.*2d at 491 n. 20. That is a timely consideration as Congress is currently reconsidering the status of millions of undocumented aliens.

In our prior decision in this case, we concluded:

> The adoption of the federal five-year eligibility bar in the state program, while not mandated, mirrors federal objectives, corresponds to an identifiable congressional policy, and "operate[s] harmoniously" within the federal program. *Plyler, supra,* 457 *U.S.* at 226, 102 *S.Ct.* at 2399, 72 *L.Ed.*2d at 805; *see Sudomir v. McMahon,* 767 *F.*2d 1456, 1466 (9th Cir.1985) ("It would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution impels the states to refrain from adhering to the federal guidelines.").

> We conclude, therefore, that plaintiffs are not likely to succeed on their equal protection claims under the United States Constitution.

> [*Guaman I, supra,* 421 *N.J.Super.* at 266–67, 23 *A.*3d 451.]

---

[10] We also note that this issue is virtually moot. According to plaintiffs, the only current non-federally funded NJFamily Care participants are resident aliens with serious medical conditions. According to the State, in 2011, the Legislature restored to participation in NJFamily Care a very small group of persons who formerly participated in the long-closed New Jersey Health Access program. There are 47 such persons currently participating in NJFamily Care, while there are at least 100 aliens participating. All of these participants are slated to be transitioned to coverage under the Affordable Care Act. *See L.* 2013, *c.* 77.

We conclude here that plaintiffs have not succeeded in their claims. For the reasons stated here and those stated in *Guaman I*, we are convinced that the challenged policy does not violate either the Federal or the State Constitution.

HARRIS, J.A.D., dissenting.

## I. Preamble

To address pressing issues relating to its ability to balance the state budget, our Legislature in 2010 ordered defendant Commissioner of Human Services—steward for the poor—to cut costs. As a means to that end, the Commissioner and her Director of Medical Assistance and Health Services terminated long-provided, state-funded health insurance benefits for thousands of impoverished aliens who have a lawful right to be in this country, while leaving intact such benefits to similarly situated citizens. Unlike my colleagues in the majority, I cannot reconcile that action with principles of equality under the law guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, paragraph 1 of the New Jersey Constitution. Accordingly, I dissent.

## II. Introduction

To resolve whether this state action is valid, a full analysis of the formidable issues left (properly) unresolved by our denial of an interlocutory injunction in *Guaman v. Velez*, 421 *N.J.Super.* 239, 248, 23 *A.*3d 451 (App.Div.2011) (*Guaman I* ) is necessary. Familiarity with that opinion is assumed.

The primary concern is whether the New Jersey Department of Human Services's 2010 (and subsequent) termination of plaintiffs' enrollment in NJ FamilyCare—a state-subsidized low cost or no cost health insurance program—passes muster under the equal protection provisions of the federal and state constitutions.

For purposes of Fourteenth Amendment jurisprudence, a two-step process must be followed. The reckoning first requires a determination of whether a strict scrutiny or a rational basis

review is to be applied to our state's mime of Congress's five-year residency classification to decline critical health care benefits to noncitizen immigrants lawfully residing in the United States. Then, after the federal standard of review is determined, defendants' regulatory scheme is justly analyzed.

Once this Fourteenth Amendment analysis is complete, the effect of our state's constitutional guarantee of equal protection is considered. While closely congruent with the federal promise, Article I, paragraph 1 of the New Jersey Constitution is, nevertheless, recognizably more protective of ensuring equal rights for equally-situated persons.

The panel in *Guaman I* concluded that, for purposes of a preliminary injunction, "plaintiffs are not likely to succeed on their equal protection claims under the United States Constitution," and likewise, "under the more flexible standard of review applied to plaintiffs' state constitutional claims, they are unlikely to succeed on the merits of their complaint." *Id.* at 267–68, 23 *A.*3d 451. Accordingly, the panel denied plaintiffs' request for an interim injunction barring the implementation of the proposed regulations.

The basis for that panel's conclusions was that "[t]he adoption of the federal five-year eligibility bar in the state program … mirrors federal objectives, corresponds to an identifiable congressional policy, and 'operate[s] harmoniously' within the federal program." *Id.* at 266, 23 *A.*3d 451 (first alteration in original) (citation omitted). Although I share some of those and the majority's views, I am unable to agree that such attributes immunize the state action from the commands of either the federal or state equal protection guaranties. Consequently, I conclude that the regulatory (and underlying legislative) contrivance is unconstitutional, and I would remand the matter to the Law Division to fashion appropriate remedies.

### III. Background

This is a putative class action that seeks a declaratory judgment and equitable remedies—primarily injunctive relief—pursuant to

42 *U.S.C.A.* § 1983; the Fourteenth Amendment to the United States Constitution; and Article I, paragraph 1 of the New Jersey Constitution.[1] Plaintiffs, purporting to represent a class of approximately 12,000 lawful noncitizen New Jersey residents, claim that defendants' Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(b)(1), which authorized termination of their enrollment in NJ FamilyCare, invidiously discriminate on the basis of alienage.

The genesis of the present controversy is traceable to the passage of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the Personal Responsibility Act), *Pub.L. No.* 104–193, 110 *Stat.* 2105 (codified as amended in scattered sections of 8 and 42 *U.S.C.A.*), which expressed national policies regarding the linkage between welfare and immigration. The Personal Responsibility Act dramatically altered alien-eligibility requirements for federal public benefits and for state and local public benefits, including access to medical benefits. *See A.B. v. Div. of Med. Assistance & Health Servs.*, 407 *N.J.Super.* 330, 343, 971 *A.*2d 403 (App.Div.), *certif. denied,* 200 *N.J.* 210, 976 *A.*2d 386 (2009).

Among the motives for enacting the Personal Responsibility Act was to restrict the availability of public benefits so that they "not constitute an incentive for immigration to the United States." 8 *U.S.C.A.* § 1601(2)(B).[2] Another statutory goal was to facilitate immigrant self-reliance so that "aliens within the Nation's borders

---

[1] In light of the Legislature's specific adoption of alienage-based durational restrictions in *L.* 2011, *c.* 85 at 111 (the 2012 Appropriations Act) and *L.* 2012, *c.* 18 at 99 (the 2013 Appropriations Act), plaintiffs have abandoned their non-constitutional challenges. See *Guaman I, supra,* 421 *N.J.Super.* at 256–63, 23 *A.*3d 451 for a discussion of this aspect of plaintiffs' former contentions.

[2] Another purpose, as identified in *Guaman I,* was "to remove the incentive for *illegal* immigration provided by the availability of public benefits." *Guaman I, supra,* 421 *N.J.Super.* at 249, 23 *A.*3d 451 (emphasis added) (citing 8 *U.S.C.A.* § 1601(6)). I note that the present case does not involve the provocative issue of *illegal* aliens in the country. *See, e.g., Arizona v. United States,* —— *U.S.* ——, 132 *S.Ct.* 2492, 183 *L.Ed.*2d 351 (2012).

not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." 8 *U.S.C.A.* § 1601(2)(A).

One mechanism employed to further these and the other goals of Congress was to foster a novel dual system of public assistance. The Personal Responsibility Act classifies aliens into two general categories: "qualified aliens" and "non-qualified aliens." 8 *U.S.C.A.* § 1641. Qualified aliens include aliens lawfully admitted for permanent residence, asylees, refugees, aliens paroled into the United States for at least one year, aliens whose deportation is being withheld, aliens who have been granted conditional entry, certain Cuban and Haitian entrants, and certain victims of battery or extreme cruelty by a spouse or other family member. 8 *U.S.C.A.* § 1641(b)-(c). All other aliens are deemed non-qualified aliens.

Qualified status is essentially a prerequisite for federal benefits: non-qualified aliens are, with some exceptions not relevant here, ineligible for federal benefits. 8 *U.S.C.A.* § 1611(a) and (b). Generally, only qualified aliens who have maintained their qualified status for five or more years are eligible for federal benefits:

Notwithstanding any other provision of law and except as provided in subsections (b), (c), and (d), an alien who is a qualified alien (as defined in section 431 [8 *U.S.C.A.* § 1641]) and who enters the United States on or after the date of the enactment of this Act [enacted August 22, 1996] is not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien's entry into the United States with a status within the meaning of the term "qualified alien."

[8 *U.S.C.A.* § 1613(a).]

While shutting the door to federal programs, Congress nevertheless permits individual states to decide whether qualified aliens would or would not receive various forms of state-subsidized public assistance. Thus, each state is permitted to invoke its discretionary right to provide state-funded health benefits to qualified aliens regardless of their durational presence in the country. 8 *U.S.C.A.* § 1622(a). In so doing, the state is granted the putative benefit of the following congressional declaration:

With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits .., a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

[8 *U.S.C.A.* § 1601(7).]

New Jersey, along with many other states, elected to provide all lawful aliens with some state-funded benefits without regard to how long such persons resided in the United States, while imposing durational prerequisites on other forms of public assistance. We described our state's relevant post-Personal Responsibility Act history as the following:

Our legislature thereafter amended the statutory definition of " '[q]ualified applicant' " to mean "a person who is a resident of this State, and either a citizen of the United States or an eligible alien[.]" *N.J.S.A.* 30:4D–3(i). An " '[e]ligible alien' " was defined, in part, as "a lawful permanent resident" who entered the United States prior to August 22, 1996, or if entry occurred after August 22, 1996, "who entered the United States at least five years ago." *N.J.S.A.* 30:4D–3(q).

In 2005, the Legislature adopted The Family Health Care Coverage Act (FHCCA), *N.J.S.A.* 30:4J–8 to –19, which re-established, reformed, and expanded a prior program to provide subsidized health insurance coverage to qualifying children, pregnant women, and low-income parents, guardians, and individuals, *"within the limits of funds appropriated or otherwise made available for the program."* *N.J.S.A.* 30:4J–12(a) (emphasis added). The new FamilyCare program was intended to address the "most serious health problem" facing state residents, namely, the "lack of access to affordable health care coverage," which forced "families to go without needed preventive and other nonemergency care until serious illness require[d] expensive hospital care." *N.J.S.A.* 30:4J–9(a). The program, which was re-opened to parents and other low-income adults, was designed, in part, to reduce State appropriations for charity care.

The FHCCA defined a " '[q]ualified applicant' " as a low income child, parent or caretaker, or single adult or couple without children, who had no health insurance, was ineligible for Medicaid, was a resident of the state, and was "a citizen of the United States, or ha[d] been lawfully admitted for permanent residence into and remain[ed] lawfully present in the United States[.]" *N.J.S.A.* 30:4J–11. Thus, in contrast to other state Medicaid programs, the Legislature elected to offer FamilyCare benefits to qualified aliens otherwise ineligible for federal Medicaid because of the five-year bar. DHS readopted the prior FamilyCare regulations, *N.J.A.C.* 10:78–1.1 to –11.5, and, in accordance with the statutory scheme, all otherwise-qualified aliens lawfully admitted for permanent residence were eligible to participate in the program regardless of the date of entry into the country or length of residency. *N.J.A.C.* 10:78–3.2(a) (amended 2010); 38 *N.J.R.* 2606 (June 19, 2006); 38 *N.J.R.* 4225 (October 2, 2006).

Eligibility for FamilyCare was expanded by the Legislature in 2008 when it
enacted the "New Jersey Health Care Reform Act," *N.J.S.A.* 26:15–1 to –2, which,
in part, expanded eligibility to parents with incomes from 133% to 200% of the
federal poverty level, and mandated that all children in the state have health care
coverage either through private or public programs. *N.J.S.A.* 26:15–1(g). The
Legislature did not amend the broad definition of a "qualified applicant" contained
in the FHCCA.

[*Guaman I, supra,* 421 *N.J.Super.* at 250–51, 23 *A.*3d 451 (alterations in original)
(footnote omitted).]

Thus, New Jersey afforded its needy population—including all
such citizens and all such lawful noncitizen immigrants—with low
or no cost health care coverage for many years. *See N.J.S.A.*
30:4J–9. As far as the record reveals, notwithstanding the De-
partment of Human Services's internal nomenclature of "legal
restricted aliens" as "Special Program Code 40," NJ FamilyCare
has been operated in a homogeneous fashion in accordance with its
legislative plan.[3] *See N.J.S.A.* 30:4J–11 (defining "qualified appli-
cants" for NJ FamilyCare as both citizens and lawful noncitizen
immigrants).

Unfortunately, a time came when the state's health insurance
safety net for impoverished lawful noncitizens was curtailed.
Triggered mainly by 2008's recessionary tsunami, our Legislature
embarked upon a strategy of belt-tightening measures that contin-
ues until this day, and which sacrificed the health care benefits of
lawful aliens receiving NJ FamilyCare in the name of fiscal
accountability.

The Legislature's first reaction to the unprecedented economic
downturn was its June 2009 adoption of the 2010 Appropriations
Act, *L.* 2009, *c.* 68. Among its defensive provisions, the 2010
Appropriations Act provided that

the Commissioner of Human Services shall adopt immediately ... such regulations
as the commissioner deems necessary to ensure that monies expended for the NJ

---

[3] The programmatic singularity of NJ FamilyCare distinguishes it from such
programs as Washington's Food Assistance Program for Legal Immigrants, *see
Pimentel v. Dreyfus,* 670 *F.*3d 1096 (9th Cir.2012), and Connecticut's State
Medical Assistance for Noncitizens Program, *see Hong Pham v. Starkowski,* 300
*Conn.* 412, 16 *A.*3d 635 (2011).

FamilyCare program do not exceed the amount hereinabove appropriated. Such regulation may change or adjust the financial and non-financial eligibility requirements for some or all of the applicants or beneficiaries in the program, the benefits provided, cost-sharing amounts, or may suspend in whole or in part the processing of applications for any or all categories of individuals covered by the program.

[2010 Appropriations Act, *L.* 2009, *c.* 68 at 108.]

An identical provision was incorporated in the 2011 Appropriations Act, *L.* 2010, *c.* 35 at 111, adopted on June 29, 2010, the same day plaintiffs filed their initial complaint.

Neither of the Appropriations Acts expressly ordered the Commissioner of Human Services to target any particular group, much less lawful noncitizen immigrants, as a means to achieve a leaner budget. However, after this litigation was initiated, the Legislature's 2012 and 2013 Appropriations Acts expressly ordered the adoption of alienage-based durational restrictions. *See L.* 2011, *c.* 85 at 111 and *L.* 2012, *c.* 18 at 99.[4]

As already noted, plaintiffs take issue with the implementation of the mandates contained in the 2010 and subsequent Appropriation Acts. There is no dispute that the adoption of Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(b)(1), which negatively impacted (and continues to impact) plaintiffs, was intended to place, in part, the burden of budget balancing on the backs of newcomer noncitizen immigrants. Thus, in order to subsidize (and perhaps save) public benefits for citizens and longer-term— i.e., greater than five years—United States-resident aliens, the durational alienage paradigm of the Personal Responsibility Act was imported jot-for-jot to New Jersey.

---

[4] The 2012 and 2013 Appropriations Acts contain identical language to implement the alienage classification at issue in this appeal:

[A]ny adult alien lawfully admitted for permanent residence, but who has lived in the United States for less than five full years after such lawful admittance and whose enrollment in the NJ FamilyCare program was terminated on or before July 1, 2010 shall not be eligible to be enrolled in the NJ FamilyCare program, provided however, that this termination of enrollment and benefits shall not apply to such persons who are either (i) pregnant or (ii) under the age of 19.

## IV. Contentions of the Parties

Plaintiffs and amici contend that the termination of NJ Family-Care benefits based solely upon the length that a legal immigrant has resided in the United States is a species of unlawful discrimination, barred by the equal protection provisions of the federal and state constitutions. Defendants counter by asserting that New Jersey merely adopted the federal durational language of the Personal Responsibility Act and is entitled to its imprimatur. Each side spins the constitutional jurisprudence to its best advantage, with plaintiffs and amici asserting that our standard of review for the federal claim must apply strict scrutiny (sometimes touted as being " 'strict' in theory but usually 'fatal' in fact," *see, e.g., Bernal v. Fainter*, 467 *U.S.* 216, 219 n. 6, 104 *S.Ct.* 2312, 2315 n. 6, 81 *L.Ed.*2d 175, 180 n. 6 (1984)). Defendants, on the other hand, claim that the state actions are to be measured by the more indulgent rational basis analysis.

Additionally, each party trumpets one particular case to principally advance its position. Plaintiffs and amici rely upon the Massachusetts Supreme Judicial Court's related opinions in *Finch v. Commonwealth Health Insurance Connector Authority*, 459 *Mass.* 655, 946 *N.E.*2d 1262 (2011) (*Finch I* ) (holding that a legislative appropriation denying state subsidies for the purchase of health care to lawfully-residing noncitizen immigrants who were ineligible for federal benefits under the Personal Responsibility Act is to be tested by strict scrutiny) and *Finch v. Commonwealth Health Insurance Connector Authority*, 461 *Mass.* 232, 959 *N.E.*2d 970 (2012) (*Finch II* ) (finding that the challenged statute, in fact, failed strict scrutiny and was unconstitutional under the Massachusetts Constitution).

Defendants stress the similarity of the facts and issues in the present appeal with those found in the Tenth Circuit's *Soskin v. Reinertson*, 353 *F.*3d 1242 (10th Cir.2004) (applying a rational basis standard in reviewing equal protection challenges to a Colorado state law that repealed optional jointly-funded Medicaid coverage to otherwise legal aliens).

The panel in *Guaman I* rejected *Finch I's* application of strict scrutiny to the problem at hand, concluding that "[g]iven the Federal goals explicitly stated in [the Personal Responsibility Act], and the complicated nature of the funding for the [NJ] FamilyCare program that implicates Federal and State resources, we find the court's reasoning in *Soskin* to be compelling." *Guaman I, supra,* 421 *N.J.Super.* at 266, 23 *A.*3d 451 (citation omitted). My review leaves me with the opposite conclusion about *Soskin's* reasoning, and instead I find the analyses of *Finch I* and *Finch II* more persuasive.

## V. Analysis

### A. First Principles

Fundamental tenets of deference start every judicial analysis of the acts of other branches of government. The legislative department is accorded the following:

As a threshold matter, we note that "every possible presumption favors the validity of an act of the Legislature." *N.J. Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 8 [292 *A.*2d 545], *appeal dismissed sub nom., Borough of E. Rutherford v. N.J. Sports & Exposition Auth.,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972). In light of the co-equal but distinct responsibilities of the judicial and legislative branches of government, "we will not declare void legislation unless its repugnancy to the Constitution is clear beyond a reasonable doubt." *In re P.L. 2001, Chapter 362,* 186 *N.J.* 368, 392 [895 *A.*2d 1128] (2006) (internal citations omitted).

[*In re T.J.S.,* 419 *N.J.Super.* 46, 56, 16 *A.*3d 386 (App.Div.2011), *aff'd,* 212 *N.J.* 334, 54 *A.*3d 263 (2012).]

A similar principle applies when the judiciary reviews acts of the executive department:

"Courts have only a limited role to play in reviewing the actions of other branches of government. In light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited." *In re Musick, Dep't of Corrections,* 143 *N.J.* 206, 216 [670 *A.*2d 11] (1996).

[*Matturri v. Bd. of Trs. of Judicial Ret. Sys.,* 173 *N.J.* 368, 381, 802 *A.*2d 496 (2002).]

Nevertheless, because this appeal deals with discrimination against a protected class—legal aliens—these rules are substantially modulated by a more searching review of the purported justification for unequal treatment. *Planned Parenthood of Cent. N.J. v. Farmer,* 165 *N.J.* 609, 619–20, 762 *A.*2d 620 (2000).

" '[W]here an important personal right is affected by government action, [our] Court often requires the public authority to demonstrate a greater "public need" than is traditionally required in construing the federal constitution.' " *Right to Choose v. Byrne*, 91 *N.J.* 287, 309, 450 *A.*2d 925 (1982) (quoting *Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp.*, 80 *N.J.* 6, 43, 364 *A.*2d 1016 (1976)).

### B. The Fourteenth Amendment to the United States Constitution

#### 1. The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides, "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const.* amend. XIV, § 1. The United States Supreme Court has interpreted the word "person" within the Equal Protection Clause to include lawfully admitted resident aliens and citizens of the United States. *Graham v. Richardson*, 403 *U.S.* 365, 371, 91 *S.Ct.* 1848, 1851, 29 *L.Ed.*2d 534, 541 (1971). Thus, both noncitizens and citizens are entitled to "equal protection of the laws of the State in which they reside." *Ibid.* The Equal Protection Clause also requires that similarly situated individuals be treated alike by the laws of a state. *City of Cleburne v. Cleburne Living Ctr.*, 473 *U.S.* 432, 439, 105 *S.Ct.* 3249, 3254, 87 *L.Ed.*2d 313, 320 (1985).

#### 2. Methodology

In evaluating whether a plaintiff has presented a viable federal equal protection claim, a court must determine what level of scrutiny applies to the government action at issue. *See City of Cleburne, supra*, 473 *U.S.* at 439–40, 105 *S.Ct.* at 3254, 87 *L.Ed.*2d at 320 ("the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection"). "The starting point for any equal protection analysis is to determine the standard of review, or level of scrutiny, that should be applied to the challenged classification." *In re Contest of Nov. 8, 2011 Gen. Election*

*of Office of N.J. Gen. Assembly,* 210 *N.J.* 29, 48, 40 *A.*3d 684 (2012)
(citing *Nordlinger v. Hahn,* 505 *U.S.* 1, 10, 112 *S.Ct.* 2326, 2331,
120 *L.Ed.*2d 1, 12 (1992)).

### 3. Alienage Discrimination and Control of Immigration

*State* discrimination against aliens is typically subject to strict
judicial scrutiny. *See Graham, supra,* 403 *U.S.* at 372, 91 *S.Ct.* at
1852, 29 *L.Ed.*2d at 542 ("Aliens as a class are a prime example of
a 'discrete and insular' minority (*see United States v. Carolene
Prods. Co.,* 304 *U.S.* 144, 152–153 n. 4 [58 *S.Ct.* 778, 783–84 n. 4, 82
*L.Ed.* 1234, 1241–42 n. 4] (1938)) for whom such heightened
judicial solicitude is appropriate."). "[T]he power of a state to
apply its laws exclusively to its alien inhabitants as a class is
confined within narrow limits." *Graham, supra,* 403 *U.S.* at 372,
91 *S.Ct.* at 1852, 29 *L.Ed.*2d at 542 (internal quotation marks
omitted).[5]

On the other hand, *federal* discrimination against aliens is
subject to only a rational basis review. *See Mathews v. Diaz,* 426
*U.S.* 67, 81–82, 96 *S.Ct.* 1883, 1892, 48 *L.Ed.*2d 478, 491 (1976)
(footnote omitted) ("The reasons that preclude judicial review of
political questions also dictate a narrow standard of review of
decisions made by the Congress or the President in the area of

---

[5] In the period after *Graham,* the Supreme Court continued to apply strict
scrutiny to state statutes discriminating on the basis of alienage. It struck a New
York statute that prohibited immigrants from working in the civil service,
*Sugarman v. Dougall,* 413 *U.S.* 634, 93 *S.Ct.* 2842, 37 *L.Ed.*2d 853 (1973), a
Connecticut statute that barred immigrants from sitting for the bar, *In re
Griffiths,* 413 *U.S.* 717, 93 *S.Ct.* 2851, 37 *L.Ed.*2d 910 (1973), a Puerto Rico law
that denied licenses to immigrant engineers, *Examining Board of Engineers,
Architects & Surveyors v. Flores de Otero,* 426 *U.S.* 572, 96 *S.Ct.* 2264, 49 *L.Ed.*2d
65 (1976), and a New York law that required immigrants to pledge to become
citizens before they could receive financial aid, *Nyquist v. Mauclet,* 432 *U.S.* 1, 97
*S.Ct.* 2120, 53 *L.Ed.*2d 63 (1977). In each instance, the Supreme Court began its
discussion by reasserting its allegiance to the holding in *Graham:* laws that
single out aliens for disparate treatment are presumptively unconstitutional
absent a showing that the classification was "necessary" to fulfill a constitution-
ally "permissible" and "substantial" purpose. *In re Griffiths, supra,* 413 *U.S.* at
721–22, 93 *S.Ct.* at 2854–55, 37 *L.Ed.*2d at 915.

immigration and naturalization."). The primacy of federal control over immigration issues was recently reaffirmed in *Arizona v. United States*, —— *U.S.* ——, ——, 132 *S.Ct.* 2492, 2498, 183 *L.Ed.*2d 351, 366 (2012):

> The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to "establish an uniform Rule of Naturalization," *U.S. Const.*, Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations.
>
> The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad. [ (Citations omitted).]

In light of Congress's overarching authority regarding immigration management, state discrimination may become subject to a rational basis review only when a state's action implements a uniform federal rule—the uniform-rule doctrine—that discriminates on the basis of alienage:

> With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power. But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.
>
> [*Plyler v. Doe*, 457 *U.S.* 202, 219 n. 19, 102 *S.Ct.* 2382, 2396 n. 19, 72 *L.Ed.*2d 786, 800–01 n. 19 (1982).]

#### 4. The Uniform–Rule Doctrine

*Guaman I* found *Soskin's* majority analysis of the uniform-rule doctrine persuasive, and its reasoning "that the appropriate standard of review lies somewhere between *Graham* and *Mathews*, to be compelling." *Guaman I, supra*, 421 *N.J.Super.* at 266, 23 *A.*3d 451. Presumably, the panel's "somewhere between" language envisioned that intermediate review, *see e.g., McCann v. Clerk of Jersey City*, 167 *N.J.* 311, 325, 771 *A.*2d 1123 (2001) (noting that intermediate scrutiny applies "when an act involves a semi-suspect

class"), was the appropriate standard of review. However, *Guaman I* did not further explicate the issue because its limited task was to assess whether plaintiffs satisfied, by clear and convincing evidence, the reasonable-probability-of-success-on-the-merits prong of *Crowe v. De Gioia*, 90 *N.J.* 126, 447 *A.*2d 173 (1982), and its progeny. *Guaman I, supra*, 421 *N.J.Super.* at 247–48, 23 *A.*3d 451.

Because I can find neither decisional law nor other authority to invoke an intermediate scrutiny standard of review relating to alienage classifications, I part company with the *Guaman I* panel. Furthermore, I am unable to subscribe to the *Soskin* majority's needlessly complex analysis of the uniform-rule doctrine because its labyrinthine logic is, at best, a strained reading of the Personal Responsibility Act. Constitutional analysis is better served by applying Occam's razor to the mission: that the simplest of competing explanations is preferred to the more complex.

*Soskin* arose when Colorado decided to withdraw Medicaid-like benefits from all aliens not statutorily entitled by the Personal Responsibility Act to receive them. *Soskin, supra*, 353 *F.*3d at 1246. After the federal statute's enactment in 1997, Colorado continued to provide uniform coverage to all of its residents—citizens and lawful noncitizens alike—despite Congress's ruling that only certain aliens were entitled to receive benefits. In 2003, however, "[f]aced with an enormous budget shortfall, [Colorado] looked to its Medicaid program for savings." *Ibid.* Acting in what it believed was authorized by the Personal Responsibility Act, Colorado's legislature removed the optional Medicaid coverage it had been providing to lawful noncitizens.

Notwithstanding *Graham's* clear statement that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause," *Graham, supra*, 403 *U.S.* at 382, 91 *S.Ct.* at 1857, 29 *L.Ed.*2d at 548, the *Soskin* majority posited that "the issue is more nuanced than the quoted proposition indicates." *Soskin, supra*, 353 *F.*3d at 1254. It further explained that the quoted sentence from *Graham* "is almost tautological," which

comment is both wholly unilluminating and totally indifferent to the plain commandment of *Graham. Ibid.* Relying solely on the principle that "courts must be deferential" to national immigration policy, *id.* at 1255, *Soskin* declared:

What Congress has done in the [Personal Responsibility Act] is, in essence, create two welfare programs, one for citizens and one for aliens. Within the aliens-only program, states have the option of including more or fewer aliens. The decision to have separate programs for aliens and citizens is a Congressional choice, subject only to rational-basis review. A state's exercise of the option to include fewer aliens in its aliens-only program, then, should not be treated as discrimination against aliens as compared to citizens. That aspect of the discrimination is Congress's doing—by creating one program for citizens and a separate one for aliens. Rather, what the state is doing is discriminating within the aliens-only program against one class of aliens as compared to other classes of aliens. [*Id.* at 1255–56.]

I disagree with this analysis of Congressional intent because it is an invention made up out of whole cloth, and relies, in part, upon the wholly inapposite case of *Doe v. Commissioner of Transitional Assistance*, 437 *Mass.* 521, 773 *N.E.*2d 404 (2002), which concerned *residency* classifications, not *alienage. Id.* at 414.

*Soskin* also repudiated the convincing opinion of the New York Court of Appeals in *Aliessa v. Novello*, 96 *N.Y.*2d 418, 730 *N.Y.S.*2d 1, 754 *N.E.*2d 1085 (2001), which involved a functionally-equivalent law to Colorado's statute. *Aliessa* held that the Personal Responsibility Act was not an example of a law subject to the uniform-rule doctrine because

in administering their own programs, the States are free to discriminate in either direction—producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics. Considering that Congress has conferred upon the States such broad discretionary power to grant or deny aliens State Medicaid, we are unable to conclude that [the Personal Responsibility Act] reflects a uniform national policy. If the rule were uniform, each State would carry out the same policy under the mandate of Congress—the only body with authority to set immigration policy. [*Id.* 730 *N.Y.S.*2d 1, 754 *N.E.*2d at 1098.]

I agree with these observations.

It is both analytically satisfying and more logical to recognize that the Personal Responsibility Act was not intended to create a uniform strategy of chaos. Instead, the congressional rule allow-

ing the exercise of state-by-state discretion created, not a mosaic blend of a well-planned and executed uniform policy, but a crazy quilt of state immigration approaches. The discretion reposed in fifty state legislatures, born of political compromise, belies uniformity. A national ship of state cannot sail a straight line if each laboring oar decides for itself whether to sit idle, pull in tandem with Congress, or row backwards. Uniformity is provided by lip service, nothing else.

Against this backdrop of asynchrony, it is apparent that federal lawmakers were expressly aware that they were not creating a *Plyler*-like uniform rule of immigration policy, and consequently a rational basis review would not be available to discriminating states. This is evident from Congress's attempt to insert a strict scrutiny antidote under 8 *U.S.C.A.* § 1601(7):

> With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits ..., a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen *the least restrictive means available for achieving the compelling governmental interest* of assuring that aliens be self-reliant in accordance with national immigration policy.

[ (Emphasis added).]

It is no coincidence that the highlighted phrase incorporates language purporting to satisfy strict judicial scrutiny. Aside from whether the legislative branch can force-feed a constitutional solution to a federal or state court, 8 *U.S.C.A.* § 1601(7) plainly evinces congressional recognition that the uniform-rule doctrine was never expected to hold sway. Why else would this safe harbor provision be inserted except to attempt to satisfy the anticipated heightened standard of strict scrutiny?

Thus, I remain unpersuaded by the *Soskin* majority on the issue of the uniform-rule doctrine and the ultimate standard of review. Instead, the direct approaches of the New York Court of Appeals in *Aliessa,* and the Massachusetts Supreme Judicial Court's analysis in *Finch I,* which are simpler and more convincing than

*Soskin's* arcane approach,[6, 7] should be the touchstones for analysis.

The facts that undergird *Finch I* are analogous, but not identical, to the present appeal. Massachusetts requires all state residents over the age of eighteen to obtain health insurance as long as it is affordable. To further this requirement, the legislature created a premium assistance program, known locally as Commonwealth Care, to ensure that health care is accessible to low income residents of the state. While both state and federal funding support payment of the premium remainders of enrollees, the federal government does not provide funding for lawfully residing aliens. Despite the federal funding restrictions, such aliens had been eligible to receive premium assistance, but at a substantial cost to the public, as state funding completely covered their premium remainders. In 2009, the Massachusetts legislature passed an appropriations bill that altered the eligibility provisions by adopting the federal eligibility standards set forth in the Personal Responsibility Act, thereby eliminating premium assistance for needy lawfully residing noncitizens, but continuing such assistance for needy citizens.

In addressing the uniform-rule doctrine, the court held the following:

> [The Personal Responsibility Act] permits the States to adopt some, all, or none of the eligibility requirements established in [The Personal Responsibility Act] as long as no benefits are paid for from the Federal fisc. The statute expresses a preference for "[s]elf-sufficiency" but does not suggest a congressional preference that benefits not be provided to qualified aliens. Indeed, the statute does not even

---

[6] I recognize that *Finch I* was not decided under the lens of the Equal Protection Clause of the Fourteenth Amendment. Nevertheless, Massachusetts' equal protection jurisprudence utilizes a three-tier system akin to the federal paradigm and the court directly addressed the question of the Personal Responsibility Act's uniformity. *Finch I, supra,* 946 *N.E.*2d at 1276–77.

[7] I also endorse the sensible straight-forward approach to the uniform-rule doctrine as articulated in *Korab v. McManaman,* 805 *F.Supp.*2d 1027, 1035 (D.Haw.2011).

express such a preference regarding aliens who, unlike members of the plaintiff class, are "not lawfully present in the United States."

[The Personal Responsibility Act] states that aliens "not lawfully present" are prohibited from receiving public benefits (State or Federal) but provides, in the same section, that States may through "affirmative[ ] provi[sion]" restore to such aliens any benefits lost as a result of [The Personal Responsibility Act]. Even regarding aliens "not lawfully present," therefore, Congress's sole interest is in the source of funds for the benefits and not in the provision or denial of the benefits themselves.

. . . .

Indeed, far from considering [the Personal Responsibility Act] to be a mandate to the States, in the statute's "statements of national policy" Congress seeks to tip the scales of equal protection analysis where "a State . . . *chooses* to follow the Federal classification in determining the eligibility of [federally ineligible] aliens for public assistance" (emphasis added). [The Personal Responsibility Act], therefore, does not require that States apply Federal eligibility requirements but instead merely declares that Federal policy will not be thwarted if States decide to discriminate against qualified aliens.

In the context of Commonwealth Care, [the Personal Responsibility Act] is thus a statement by Congress that the Federal government will be subsidizing the State's provision of benefits to some residents (citizens and eligible aliens) but not to others (federally ineligible aliens). This is a financial impediment to State action but not a mandate under the supremacy clause that might require the application of rational basis review. Where the State is left with a range of options including discriminatory and nondiscriminatory policies, its selection amongst those options must be reviewed *under the standards applicable to the State and not those applicable to Congress*.

[*Finch I, supra,* 946 *N.E.*2d at 1276–77 & n. 18 (citations omitted).]

Therefore, the court concluded that the local decision to adopt the time-sensitive eligibility criterion of the Personal Responsibility Act must be reviewed under the standard of review applicable to Massachusetts, and not Congress. Recognizing Massachusetts's well-established equal protection jurisprudence, the court held that a strict scrutiny standard of review should be used to determine the constitutionality of Commonwealth Care's alienage-based classification. *Id.* at 1277.

Even if it were true that "[d]etermining whether or not [the Personal Responsibility Act] provides a 'uniform rule' is an elusive, and ultimately unsatisfying, exercise," *Guaman I, supra,* 421 *N.J.Super.* at 263, 23 *A.*3d 451 *Finch I's* transparent explication of the uniform-rule doctrine—resulting in the application of *Gra-*

*ham's* strict scrutiny analysis—is convincing. It is not enough for the Equal Protection Clause's purposes that New Jersey's enactment of the five-year eligibility bar in NJ FamilyCare merely "mirrors federal objectives, corresponds to an identifiable congressional policy, and 'operate[s] harmoniously' within the federal program." *Guaman I, supra,* 421 *N.J.Super.* at 266, 23 *A.*3d 451 (alteration in original). Because that federal program does not itself operate as a uniform solution to an immigration-related problem, the fact that New Jersey seeks shelter under its auspices for a discriminatory regulatory scheme enacted more than a decade after the Personal Responsibility Act's adoption does not insulate such state action from strict scrutiny. *See Aliessa, supra,* 730 *N.Y.S.*2d 1, 754 *N.E.*2d at 1098 (noting that states "are free to discriminate in either direction—producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics").

## 5. Strict Judicial Scrutiny

Here, the actual merits analysis that was not required to be performed in *Guaman I* is conducted. Plaintiffs argue that Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(b)(1) fail strict judicial scrutiny under the Equal Protection Clause because the alienage-based classification chosen to treat the State's fiscal infirmity is not suitably tailored to serve a compelling state interest. *See City of Cleburne, supra,* 473 *U.S.* at 440, 105 *S.Ct.* at 3254, 87 *L.Ed.*2d at 320 (noting that classifications such as race, alienage, or national origin are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others").

Without conceding that strict scrutiny applies, defendants argue that "the need to conserve state fiscal resources and the need to assure that state expenditures do not exceed appropriations" are reasons to validate the state discrimination. Defendants trumpet the need for a constitutionally balanced budget, *N.J. Const.* art.

VIII, § 2, ¶ 2, and note that *N.J.S.A.* 30:4J–12(e) commands (in essence) that NJ FamilyCare be made available only within the "constraints of fiscal responsibility and within the limits of available funding in any year." Defendants have not explained, however, why their reduction in the ranks of NJ FamilyCare was visited only upon noncitizen immigrants, leaving equally-positioned citizens untouched. If the effects of the post–2009 recession require shared sacrifices, the State has failed to prove why needy citizens should continue to receive their full NJ FamilyCare benefits, while needy lawful noncitizens receive nothing.[8]

Among the many teachings of *Graham* is the following: "a State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify [the state's discriminatory actions]." *Graham, supra,* 403 *U.S.* at 374, 91 *S.Ct.* at 1853, 29 *L.Ed.*2d at 543. The Supreme Court noted that legal aliens are in many ways indistinguishable from citizens, and then provided a few examples:

[T]he justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes and may be called into the armed forces. . . . There can be no "special public interest" in tax revenues to which aliens have contributed on an equal basis with the residents of the State.

[*Id* at 376, 91 *S.Ct.* at 1854, 29 *L.Ed.*2d at 544 (internal quotation marks and citations omitted).]

I cannot accede to defendants' view that fiscal concerns qualify as a compelling state interest under the Equal Protection Clause. *See Bernal, supra,* 467 *U.S.* at 219, 104 *S.Ct.* at 2315, 81 *L.Ed.*2d at 179 (holding that a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny, that is, the law must advance a compelling state interest by the least restrictive means available); *see also Finch II, supra,*

---

8 Defendants argue that their decision to eliminate benefits for "this alien subset," was reasonable "because it maximized program funds." There is not a speck of evidence in this record to support this contention, but even if there were, defendants fail to explain how the choice of favoring citizens over noncitizens achieved this salutary result.

959 *N.E.*2d at 976 ("Fiscal considerations alone cannot justify a State's invidious discrimination against aliens.").

I also reject defendants' claim that NJ FamilyCare's excision of newcomer noncitizens is validated by 8 *U.S.C.A.* § 1601(7)'s expression of a state's satisfaction of strict judicial scrutiny. As already noted, this congressional expression purports to invest state actions that mimic federal eligibility requirements with immunity from the otherwise-likely fatal effects of strict judicial scrutiny.

In pertinent part, the statute says that "a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy." *Ibid.* Defendants' Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(b)(1), which give no lip service to national immigration policy whatsoever, do not enjoy the imprimatur of constitutional fulfillment just because the national legislature said so.[9]

It is always wise to take the legislative and executive branches at their word because it is a dangerous business for the judiciary to infer unspoken purposes into a regulatory matrix. There is no proof that immigration consequences—good or bad—were ever considered in the actions that are under review. My sense is that defendants' post hoc immigration rationale is an improper attempt to utilize a litigational advantage that is abhorred by the square corners doctrine. *See CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment,* 414 *N.J.Super.* 563, 585, 999

---

[9] Defendants do not argue that the Supremacy Clause is implicated in this appeal. *U.S. Const.* art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

*A.*2d 1151 (App.Div.2010) ("For almost a half-century, our State's public policy jurisprudence has expressly insisted that governmental agents and units of government observe certain standards and norms—particularly during litigation—that are beyond reproach.") (citing *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 426, 495 *A.*2d 1313 (1985)); *see also Finch II, supra,* 959 *N.E.*2d at 975 ("Strict scrutiny requires an inquiry into the actual purpose or motivation behind the legislation rather than any purpose hypothesized post hoc during litigation.").

Additionally, it is highly doubtful that Congress's instruction to the courts to find a compelling interest in this particular species of fiscal motivation would withstand review under a separation of powers analysis. "[T]he Judiciary is the final arbiter of the institutional commissions articulated in the Constitution." *Gallenthin Realty Dev., Inc. v. Borough of Paulsboro,* 191 *N.J.* 344, 358, 924 *A.*2d 447 (2007) (citing *Marbury v. Madison,* 5 *U.S.* (1 *Cranch* ) 137, 177, 2 *L.Ed.* 60, 73 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.")). The Constitution grants Congress the power to regulate the details of immigration, not the power to decide when and where its laws are subject to a particular scope of review. The former power is reflective of the constitutional recognition that certain matters requiring political judgments are best left to the political branches. "The latter would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress . . ., [not the judiciary], say[s] 'what the law is.' " *Boumediene v. Bush,* 553 *U.S.* 723, 765, 128 *S.Ct.* 2229, 2259, 171 *L.Ed.*2d 41, 77 (2008) (quoting *Marbury, supra,* 5 *U.S.* at 177, 2 *L.Ed.* at 73). To automatically accede to Congress's foisting of a scope of review upon the judiciary would grant "a dangerous permission slip for the arrogation of power." *Decker v. Northwest Envtl. Def. Ctr.,* — *U.S.* ——, ——, 133 *S.Ct.* 1326, 1341, 185 *L.Ed.*2d 447, 466 (2013) (Scalia, J. concurring part and dissenting in part).

Thus, in the absence of defendants' satisfaction of their independent burden of proof under the strict scrutiny required by the Equal Protection Clause, I am unable to conclude that Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(b)(1) are constitutionally sound under the Fourteenth Amendment.

### C. The New Jersey Constitution

#### 1. Article I, Paragraph 1

The state right of equal protection derives from *N.J. Const.* art. I, ¶ 1, which provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." "Equality of treatment is a dominant theme of our laws and a central guarantee of our State Constitution." *Lewis v. Harris*, 188 *N.J.* 415, 456, 908 *A.*2d 196 (2006). It has long been recognized that our constitution's equal protection provision, "like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike." *State v. O'Hagen*, 189 *N.J.* 140, 164, 914 *A.*2d 267 (2007).

#### 2. Methodology

Under our equal-protection jurisprudence, a governmental scheme that treats two classes of similarly situated people differently must "bear a substantial relationship to a legitimate governmental purpose." *Lewis, supra*, 188 *N.J.* at 443, 908 *A.*2d 196. "Equal protection does not preclude the use of classifications, but requires only that those classifications not be arbitrary." *Doe v. Poritz*, 142 *N.J.* 1, 91, 662 *A.*2d 367 (1995).

Under state law, our courts have rejected the tiered federal analytical framework of strict versus rational basis scrutiny. *Guaman I, supra*, 421 *N.J.Super.* at 267, 23 *A.*3d 451. Instead, we require the application of a balancing test consisting of three elements: "(1) the nature of the right asserted; (2) the extent to which the statute intrudes upon that right; and (3) the public need

for the intrusion." *O'Hagen, supra,* 189 *N.J.* at 164, 914 *A.*2d 267. Although the federal and state tests are different, they "weigh the same factors and often produce the same result." *Sojourner A. v. N.J. Dep't of Human Servs.,* 177 *N.J.* 318, 333, 828 *A.*2d 306 (2003). However, the reach of our constitution is broader than its federal counterpart. *State v. Chun,* 194 *N.J.* 54, 101–02, 943 *A.*2d 114 (2008).

### 3. Balancing Test

The nature of the right asserted in this appeal relates to the availability of health insurance benefits to poor people who pay taxes that fund such benefits for others. According to the record, 12,000 residents depend upon NJ FamilyCare for vital health care access. This heavy reliance on the program indicates how necessary and effective it is, and clearly demonstrates how substantially the restriction operates against the protected class.

Although the New Jersey Constitution does not guarantee a fundamental right to health, the Court has recognized "that New Jersey accords a high priority to the preservation of health." *Right to Choose, supra,* 91 *N.J.* at 304, 450 *A.*2d 925. Indeed, when enacting the current version of NJ FamilyCare, the Legislature stated: "The expanded health care coverage provided by this act builds on New Jersey's longstanding commitment to assure access to quality health care that is provided in an efficient and effective manner and at a reasonable cost." *N.J.S.A.* 30:4J–9(h).

Defendants' purported need to excise 12,000 lawful noncitizens from NJ FamilyCare's protection is based—aside from the litigation-induced immigration policy argument—on fiscal concerns. "Although preservation of fiscal integrity is a valid state interest, a State may not accomplish that goal by establishing 'invidious' distinctions between citizens." *Sanchez v. Dep't of Human Servs.,* 314 *N.J.Super.* 11, 27, 713 *A.*2d 1056 (App.Div.1998). Moreover, the durational residence requirements at work in this appeal bear no connection with any of our Legislature's purposes or goals to foster fiscal stability in a difficult economic climate.

From a state constitutional standpoint, defendants' response to the open-ended invitation of the 2010 and 2011 Appropriations Acts to pare spending, and their faithfulness to the commands of the 2012 and 2013 Appropriations Acts to actively discriminate against short-term noncitizens, does not comport with our state's "central guarantee" of "[e]quality of treatment." *Lewis, supra*, 188 *N.J.* at 456, 908 *A.*2d 196. However laudable the overall goal of ensuring the health of the state's finances, it does not trump the health care needs of lawful noncitizens who are powerless—meaning without the right to vote—to participate in the political process. Such invidious discrimination against a discrete and insular minority is repugnant to our State Constitution.

## VI. Conclusion

Equal treatment requires at the very least that government be as fair to all poor noncitizens as it is to all poor citizens in the provision of affordable health care opportunities. Both groups contribute to the taxes that pay for NJ FamilyCare and the record does not establish a principled distinction between the two groups to justify the five-year waiting period visited upon greenhorn aliens. The State offered no evidence that newcomer-noncitizens abuse health care benefits or disproportionately use its largess as a rationale to target the individuals who have been disadvantaged solely on the basis of an arbitrary time-dependent criterion.

"The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here." *Arizona, supra,* —— *U.S.* at ——, 132 *S.Ct.* at 2510, 183 *L.Ed.*2d at 379. Defendants' Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(b)(1) deny a range of public benefits to lawful permanent resident aliens, while maintaining such benefits for similarly positioned citizens. Both federal and state equal protection jurisprudence counsel against such disparate treatment, and I would declare defendants' measures unconstitutional.